702 So.2d 648 (1996)
Shirley Hartmann, Wife of/and Richard P. CARRIERE,
v.
BANK OF LOUISIANA.
No. 95-C-3058.
Supreme Court of Louisiana.
December 13, 1996.
Concurring Opinion December 16, 1996.
Concurring Opinion February 18, 1997.
Opinion on Rehearing October 31, 1997.
Rehearing Denied December 12, 1997.
Dissenting Opinion December 12, 1997.
*650 Henry L. Klein, Mack E. Barham, Robert Elton Arceneaux, Barham & Arceneaux, New Orleans, for Applicant.
Mack E. Barham, Robert Elton Arceneaux, Julia Symon deKluiver, Barham & Arceneaux, New Orleans, Henry L. Klein, New Orleans for Applicant on Rehearing.
Clarence F. Favret, III, Marshall J. Favret, Favret, Demarest, Russo & Lutkewitte, New Orleans, for Respondent.
Mark Philip Folse, Baton Rouge, for Louisiana Bankers Association (Amicus Curiae).
Concurring Opinion of Chief Justice Calogero December 16, 1996.
Concurring Opinion of Justice Lemmon February 18, 1997.
Dissenting Opinion of Justice Johnson December 12, 1997.

ON WRIT OF CERTIORARI
JOHNSON, Justice.[*]
We granted certiorari to determine whether the court of appeal properly reviewed the trial court's judgment rendered in favor of the plaintiffs. Pursuant to a lease agreement, the plaintiffs were awarded $398,032.05 for past rents, taxes and attorney's fees as compensation for the use of their immovable property upon which defendant's separately owned restaurant was constructed. On appeal, the damage award for past rents was affirmed, but that portion of the judgment for attorney's fees was vacated and the case was remanded so that a determination could be made regarding the reasonableness of the amount. For the reasons that follow, we affirm the appellate court's decision.

FACTS
Plaintiffs owned a commercial plot of land located in Metairie, Louisiana bearing Municipal No. 2712 N. Arnoult Road. In order to develop this plot, the plaintiffs entered into a ground lease with Frank Occhipinti, Inc. (hereinafter referred to as Occhipinti) on April 23, 1982. The lease contemplated the development of a restaurant on plaintiffs' land. Occhipinti built the restaurant with financing through Gulf Federal Savings and Loan Association (hereinafter referred to as Gulf Federal). The lease was then amended to accommodate financing on January 10, 1983, and again on March 1, 1983.
The loan was refinanced through Bank of the South in 1987 resulting in a further amendment. At that time, a collateral mortgage in the amount of $1,200.000.00 was executed on behalf of Bank of the South. As security, Occhipinti used the leasehold interest along with the restaurant and improvements located on plaintiffs' property. The lease was again amended to protect Bank of the South's interest by substituting it in place of Gulf Federal. Plaintiffs' original lease with Occhipinti was for a five year period commencing on October 23, 1982 but contained an option to extend the lease for two additional five year periods, or until 1997. However, after the substitution involving Bank of the South, the lease contained an additional option to extend it until 2002. As successor in interest, Bank of Louisiana (hereinafter referred to as BOL) acquired the assets of Bank of the South and became the holder of the note secured by the collateral mortgage on the leasehold interest.
Occhipinti filed for relief from his creditors in Bankruptcy Court in 1988. These proceedings were eventually converted from a *651 Chapter 11 to a Chapter 7 proceeding on March 28, 1989. The bankruptcy trustee found the leasehold improvements contained no equity over and above the mortgage or liens affecting this property, and alternatively that if there was any equity, it was insufficient to justify administration. He then rejected the ground lease with improvements and dismissed it from the proceedings.[1]
Occhipinti failed to pay the 1988 property taxes as stipulated within the lease,[2] and in January 1988, he failed to make rent payments. The plaintiffs then issued a notice of default to Occhipinti. When the default was not cured, the plaintiffs declared the lease terminated and served Occhipinti with a notice to vacate the premises on July 7, 1989. BOL was provided with a copy of each notice. An eviction proceeding was then filed on July 19, 1989 in the 24th Judicial District Court in the Parish of Jefferson.
On July 25, 1989, BOL filed a petition for executory process for the Occhipinti note and collateral mortgage. At a sheriff's sale held on September 20, 1989, BOL purchased Occhipinti's leasehold interest which included the building as well as the improvements located on plaintiffs' land. Subsequent to this acquisition, the plaintiffs amended their eviction proceeding and named BOL as a defendant demanding that the lease be terminated and the premises vacated.[3]
In a judgement rendered on January 8, 1990, the trial court ordered the defendants to vacate the premises, found that the lease had terminated and granted plaintiffs a lessor's privilege. BOL appealed this decision and the court of appeal reversed. The appellate court held that: the lessors could not terminate the lease and evict BOL, which was Occhipinti's successor; the lease did not terminate due to the bankruptcy trustee's rejection as an asset; and, a dispute as to ownership could not be decided in a summary proceeding. Carriere v. Frank A. Occhipinti, Inc., 570 So.2d 43 (La.App. 5 Cir. 1990), writ denied, 575 So.2d 392 (La.1991).
On March 7, 1991 plaintiffs filed suit against BOL asserting that the bank was liable to them for rental payments under the lease from the date of the judicial sale, property taxes from 1988 through 1993 which represented Occhipinti's default period, and necessary repairs to the building. Their petition was amended seeking relief for unjust enrichment. BOL filed an answer and reconventional demand for slander of title. BOL then filed for summary judgment which the trial court granted, dismissing plaintiffs' suit. On appeal, it was held that summary judgment was precluded because a genuine issue of material fact existed as to whether the ground lease continued to remain in effect after the building was purchased at the sheriff's sale. Carriere v. Bank of Louisiana, 602 So.2d 155 (La.App. 5 Cir.1992). Accordingly, the trial court's judgment was vacated and the case was remanded to determine whether the ground lease was still in effect and if so, did it contemplate the present situation and, if not, what is the nature of the relationship between the landowners and BOL. Id. at 157
After a trial on the merits, judgment was rendered in favor of the plaintiffs in the amount of $398,032.05 representing past rent from September 20, 1989 to February 23, 1994 for a total of $330,820.01; property taxes in the amount of $12,212.04; and, attorney's fees in the amount of $55,000.00. BOL appealed and the appellate court affirmed in part, vacated in part and remanded. It held *652 that: (1) its prior holding that the ground lease survived the sheriff's sale was the law of the case; (2) in purchasing lessee's leasehold interest, including the building and the improvements, BOL exercised its option under the lease and stepped into the shoes of lessee, thus obligating the bank to pay rent; (3) the record did not support an award of attorney's fees, and required remand for reconsideration of reasonableness. Carriere v. Bank of La. in New Orleans, 662 So.2d 491 (La.App. 5 Cir.1995). After a rehearing was denied by the court of appeal, BOL sought relief from this court. In a May 10, 1996 order, we granted relator's application for review. Shirley Hartmann, Wife of/and Richard P. Carriere v. Bank of Louisiana in New Orleans, 676 So.2d 99 (La.1996).

BOL'S CONTENTIONS
In its application, BOL contends that the fifth circuit's initial opinion in Carriere v. Occhipinti, supra properly reversed the eviction of BOL. BOL states that the appellate court lacked jurisdiction to reverse the trial court's ruling that the lease terminated and whatever that court said regarding termination was obiter dicta and cannot constitute the law of the case. Further, relator argues that the lease between plaintiffs and Occhipinti terminated in a number of ways. In June of 1989, it was terminated pursuant to default provisions. The lease provides that in the event of non-payment of rent, lessor may declare the said term ended and that is precisely what plaintiffs did on June 12, 1989. It also terminated when BOL acquired the building at the sheriff's sale. When BOL foreclosed, it acquired whatever right, title and interest Occhipinti had in the contract of lease. Occhipinti had no rights under the lease in September of 1989 when the building was acquired at the sale. BOL's only recovery was the building which plaintiffs argue is theirs and is consistent with the proposition that the lease terminated.
Next, BOL states that it never exercised an option to "step into the shoes" of Occhipinti. The appellate court erred when it penalized a foreclosing bank because it merely purchased whatever collateral it had at a sheriff's sale. By the time BOL was declared the adjudicatee at the sale, Occhipinti had declared bankruptcy.
Moreover, they allege that the court of appeal ignored multiple provisions in the lease. This lease was amended three times to assist Occhipinti in obtaining financing and to induce the lenders to advance construction funds with the expectation of being protected by the first mortgage. The court further erred in its application of the law.

PLAINTIFFS' ARGUMENT
The plaintiffs argue that BOL is liable for rent under the contract. The bank became a party to the contract under paragraph 5 of the January, 1983 amendment which gave them the right to "step into the shoes" of the lessee and take over the lease. When this was done, BOL bound itself to pay rent as lessee. In simple and plain language of the lease, the lender had the right to step into the shoes, and the intent of the parties was that if BOL foreclosed and took over the property, it would be obligated to pay rent. The evidence substantially showed that BOL took over the building situated on plaintiffs' property, exploited the building and their land, and therefore "stepped into the shoes" of the lessee. When this occurred, BOL became obligated to pay rent.
The plaintiffs further argue that BOL is simultaneously liable for rent by operation of law. By foreclosing on the leasehold estate and building, BOL became liable for payment of rent to the Carrieres in accords with Louisiana law. Also, BOL had to have relied on some "right" which would justify its building remaining on plaintiffs' separately owned land. Plaintiffs submit that this right must be the lease in question, and by law, BOL is obligated to pay rent.

DISCUSSION
We wish to make it clear that the procedural history of this case reveals that any issue regarding the lease between these parties is res judicata. In the appellate court's initial opinion, it was held that as between BOL and the plaintiffs, the lease remained in effect. Therafter, the plaintiffs sought relief from this court but their application was denied.
*653 Louisiana law allows buildings and other constructions permanently attached to the ground to belong to someone other than the owner of the ground. They are presumed to belong to the owner of the ground, unless separate ownership is evidenced in the conveyance record of the parish in which the immovable is located.[4] Article 493 of the La. civil code provides in pertinent part:
"Buildings, other constructions permanently attached to the ground, ... made on the land of another with his consent belong to him who made them. They belong to the owner of the ground when they are made without his consent.
When the owner of the buildings, other constructions permanently attached to the ground, ... no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to the former owner."
Article 493 gives the owner of the improvements the right to remove them within a 90 day period after receiving a written demand to remove them. If he does not remove the improvements then the landowner acquires ownership. Guzzetta v. Texas Pipe Line Co., 485 So.2d 508 (La.1986).
Moreover, the article specifically states that there has to be a "right" to keep the building on the land of another. In order to resolve the issue at hand, we must look to the essence of this right. The Carrieres strongly argue that the right BOL had to continue to remain on their land derived from the original lease and its amendments. Whereas, BOL argues that the lease did not apply because it terminated and the only purchase made at the sheriff's sale in September, 1989 was that of a leasehold which does not contemplate the payment of rent, they acquired only the building, i.e. the right of occupancy.
Our jurisprudence has recognized the distinction between the sale of a lease which includes the obligation to pay rent and the sale of the mere right of occupancy which does not include the rental obligation, as far back as 1887. See Walker v. Dohan, 39 La.Ann. 743, 2 So. 381 (La.1887); Ranson v. Voiron, 176 La. 718, 146 So. 681 (La.1933); and Morrison v. Faulk (La.App. 4 Cir.1963) 158 So.2d 837, writ refused, 245 La. 643, 160 So.2d 229 (1964). However the facts and circumstances of those cases are distinguishable from the instant matter. In Walker, that which was sold at a sheriff's sale was "the right of occupancy". In Ranson, plaintiff brought suit for unpaid monthly notes and after obtaining a writ of fieri facias, the sheriff seized and advertised for sale, defendant's right of occupancy to the leased premises at issue. Likewise, in Morrison, after defendant defaulted for nonpayment of rent, the sheriff auctioned off the "right of occupancy" of the leased premises along with the movables situated therein.
While we recognize the severability involving the right of occupancy from the obligation to pay rent, unlike these cases, the sheriff's sale in September, 1989 involved more than the mere right of occupancy. BOL purchased the leasehold interest which had to include the lease, because as mentioned previously, any issue involving the enforceability of the lease is res judicata. The only manner in which BOL or any other entity could occupy the premises was to assume the position that its predecessor had under the lease, and along with assuming the right to occupy the building, for reasons further explained attaches the obligation to pay rent.
But what is a leasehold? This term is found in several sections of our revised statutes which contemplate the existence of a lease. See La.R.S. 9:1131.10; 9:1131.24; 44:1; 56:499.2; and, 56:700.11. Because these statutes are not directly on point as to a concrete definition, we must look elsewhere. Leasehold is defined in Black's Law Dictionary as: "An estate in real property held by lessee/tenant under a lease. The four principal types of leasehold estates are the estate for years, periodic tenancy, tenancy at will, and tenancy at sufferance. The asset representing *654 the right of the lessee to use leased property."[5] In U.C.C. § 2A-103, Leasehold interest is defined as the interest of the lessor or the lessee under a lease contract.
By its plain wording, the definition calls for a lease. Therefore, we reject BOL's persistent argument that they did not acquire the obligation of having to pay rent because the law clearly states that there must be some "right" to allow a building, improvements or crops to belong to someone other than the owner of the ground. Here, the right is clearly stated in the lease and BOL became a party when it acquired the assets of its predecessor, Bank of the South. If not, then as contended in the eviction proceeding naming BOL as a defendant, the plaintiffs could have became owner of the improvements after the expiration of the 90 day period cited in La.C.C. art 493. The final result is that by operation of law, BOL must have a right to allow its building to remain on the property of another. This court is not persuaded by BOL's argument that the lease terminated when the leasehold was purchased at sheriff's sale.

DID THE LEASE TERMINATE?
The next issue which we must decide is whether BOL as separate owner of the building and improvements is labile to pay rent to the plaintiffs as owners of the land on which the building is constructed, pursuant to a lease executed between the owners of the ground, the original lessee as developer of the improvements placed on the land, and the lender who provided financing for the improvements before taking over the premises and occupying it for its intended use. Before deciding whether or not rent is owed from BOL, initially we must decide if the lease terminated.
A lessee's failure to pay timely does not automatically terminate a lease. Huckabay v. Red River Waterway Com'n, 663 So.2d 414 (La.App. 2 Cir.1995), writ denied 669 So.2d 403 (La.1996). Although the Carrieres attempted to terminate the lease because of non-payment, the appellate court ruled that the issue of whether the ground lease was still in effect could not be decided in a summary fashion. Because cancellation of a lease is not favored in Louisiana and the lessor's right to terminate a lease upon lessee's failure to timely remit rental payments is subject to judicial control, we find that the appellate court properly overruled the trial court's judgment of January 8, 1990 which terminated the lease. Huckabay, supra; Ergon, Inc. v. Allen, 593 So.2d 438 (La.App. 2d Cir.1992).
In Ergon, supra, the defendant owned a piece of property located in Union Parish which he leased to the plaintiff who was in the natural gas business. In order to transport its product, a compressor station was constructed on the leased premises. At that time, Ergon, Inc. was grossing over $3,000.000.00 per year in sales while paying $350.00 annually pursuant to its lease. The rental payment was due on or before May 26 of each year, but in 1986, for the second time, defendant paid the rent untimely. Ergon attempted to tender the past due rent but plaintiff refused. Ergon then filed a petition to expropriate the property and Allen reconvened praying that the plaintiffs be evicted from his land for non-payment, and that all improvements remain because they had not been removed within 180 days after termination of the lease. Relying on Atkinson v. Richeson, 393 So.2d 801 (La.App. 2d Cir. 1981) the trial court invoked the doctrine of judicial control for the termination of leases.[6] The lower court held that all parties intended for the lease to continue for at least 15 years and that cancellation would cause substantial financial harm to plaintiff, royalty owners and consumers. After a written judgment was approved by the attorneys of record declaring that the lease was valid and enforceable, defendant appealed claiming that the trial court erred when it invoked the doctrine of judicial control. On appeal, the Second Circuit opined as follows:

*655 "As we interpret the application of judicial control, Louisiana courts are vested with discretion under certain circumstances to decline to grant a lessor cancellation of a lease although such right appears to be available to him. See Lee v. Abernathy, 19 So.2d 670 (La.App. 2d Cir.1944); Farmers Gas Co. v. LaHaye, 195 So.2d 329 (La.App. 3d Cir.1967); Housing Authority of City Of Lake Charles v. Minor, 355 So.2d 271 (La.App. 3d Cir.1977), writ denied 355 So.2d 1323 (La.1978); and Tullier v. Tanson Enterprises, Inc., 359 So.2d 654 (La. App. 1st Cir.1978) reversed on other grounds, 367 So.2d 773 (La.1979). Although LSA-C.C. Art. 2712 would seem to mandate the cancellation of a lease upon failure to comply with its terms, cancellation of leases is not favored in Louisiana law. Tullier v. Tanson Enterprises, supra; Stoltz v. McConnell, 202 So.2d 451 (La.App. 4th Cir.1967), writ denied 251 La. 231, 203 So.2d 559 (1967)."
Ergon at 440.[7] The appellate court upheld the trial court's application of this doctrine based on the unusual circumstances involved, namely the overwhelming affects on Ergon, the royalty owners and consumers against plaintiff's loss of $350.00 in annual rent.
We find that application of the doctrine of judicial control is proper because of the unusual circumstances present. Here, the owners of the land were being totally deprived of the use and enjoyment of their property while they continued to have the obligation of paying taxes. On the other hand, BOL acquired ownership of the building and improvements during the time that plaintiffs were in the process of acquiring the right to occupy the building placed on their land. BOL had the benefits of: (1) not having to pay rent to the landowner; (2) having the landowner pay the property taxes; and (3) use and enjoyment of the land and building. Therefore, we do not find that the lower court erred when it applied this doctrine.
The appellate court followed the decision of Hae Woo Youn v. Maritime Overseas Corp., 605 So.2d 187 (La.App. 5 Cir.1992), and applied the "law of the case" principle and held that the lease had not terminated and was still in effect after the sheriff's sale. This rule is applied to appellate level cases with regards to parties who have had the identical issue presented and decided earlier by that appellate court in an earlier proceeding. Mayer v. Valentine Sugars, Inc., 444 So.2d 618 (La.1984). The law of the case principle concerns the binding force of trial court rulings during later stages of trial, conclusive effects of appellate rulings on remand, and that ordinarily, an appellate court will not reconsider its only rulings of law on subsequent appeal in the same case. Barnett v. Jabusch, 649 So.2d 1158 (La.App. 3 Cir.1995); Greater New Orleans Car Dealers Ass'n v. Louisiana Tax Com'n, 663 So.2d 797 (La.App. 5 Cir.1995); Dodson v. Community Blood Center of Louisiana, Inc., 633 So.2d 252 (La.App. 1 Cir.1993), writ denied 634 So.2d 850 (La.1994), writ denied 634 So.2d 851 (La.1994). Applying this rule to the instant matter we find the issue regarding whether the lease had terminated was decided in Carriere v. Occhipinti, supra. There, the same parties were involved (Carrieres and BOL) and the issue of the lease was decided. Therefore the court of appeal properly applied the "law of the case" doctrine in finding that the lease had not terminated. The court correctly pointed out that even BOL recognized that the leasehold belonged to Occhipinti, not the Carrieres.[8] By analogy, the appellate court concluded that had the ownership of the leasehold been vested in the plaintiffs, the building would have belonged to them subject to the mortgage and they too would have appeared as a defendant at the sheriff's sale. However, because the facts show that only Occhipinti appeared as a defendant at the sheriff's sale, we find this conclusion proper.
Moreover, evidence of a continued lease stems from the amendments made to the lease after January, 1983 which added another *656 party to the lease. This party is the lender, BOL who intervened in the lease.

DID BOL STEP INTO OCCHIPINTI'S SHOES?
Next, we must be decide whether or not BOL exercised its option to stand in the shoes of the lessee. In the January 10th amendment, article 5 states:
"LESSOR and LESSEE agree that the lender shall be permitted, at its option, to "stand in the shoes" of the LESSEE and to exercise, on behalf of the LESSEE or itself, all options, charges or expense encumbered upon LESSEE to pay. However, the exercising of these rights and meeting these obligations shall not be mandatory on the part of the LENDER but shall be optional."
The facts of this case reveal that BOL purchased the lease and the building at sheriff's sale and attempted to rent the building on at least two occasions. During trial, the building was being operated as its intended use, i.e., a restaurant. The appellate court concluded that these actions equate to "stepping into the shoes" of lessee.[9] This conclusion is well supported by the evidence, therefore we will not disturb it.
Is BOL liable for rent? Even if the lease is held to have applied to BOL, they argue that the court of appeal ignored express provisions which were included to induce the lender to make the subject loan and to protect it in the event of default. They rely on paragraph 10(E) of the original ground lease which states:
"No liability for the payment of rental or the performance of any of Lessee's covenants and agreements hereunder shall attach to or be imposed upon any mortgagee or holder of any indebtedness secured by any mortgage upon the leasehold estate, all such liability being hereby expressly waived by Lessor."
The appellate court determined that this provision did apply to BOL after Occhipinti's default and their purchase at sheriff's sale. Article 10 of the original lease entitled MORTGAGING OF LEASEHOLD ESTATE dealt with a situation where the lessee would mortgage its leasehold, but because the mortgagee (BOL) purchased the leasehold at sheriff's sale, Occhipinti's debt to the bank was extinguished by confusion.[10] Therefore, this provision does not apply to the instant situation because the mortgage placed on the leasehold no longer existed after BOL made the purchase at the sheriff's sale. Confusion extinguished the mortgage. See Ranson, supra, where a lessor purchased lessee's right of occupancy at a sale under the execution of a judgment and their lease was terminated by confusion.
The lease is a synallagmatic contract[11], therefore the intent of the parties must be ascertained.[12] During trial, plaintiff Richard Carriere stated it was his impression that whoever would buy the building and own it would step into the shoes of Occhipinti, meaning that they would become lessee. His attorney, Marshall Favret testified that he drafted the original ground lease and stated that rent is due from the party who steps into the shoes of the lessee. The following colloquy took place when Favret was questioned as to his interpretation of the "step into shoes" clause:
Q. With respect to paragraph five of the amendment, what was the intent or the understanding that you discussed with the Carrieres as they are advised that with respect to negotiation and execution of that provision?
A. My understanding and what I explained to the Carrieres and what our intent was, was that the lender had the right to step into the shoes of the lessee, take over the lease, cure defects, but had no obligation to do that. It was optional, but if they wanted to protect the lease or their rights, they had the right to do so.
Q. If they did do so, what would be the consequences?

*657 A. They would have to meet all the obligations of the lease. They would have all the rights, but all the obligations as well, specifically to pay rent, to pay insurance, to pay taxes, to keep the premises in good, in proper conditions, make repairs.
John A. Mmahat testified that he represented Gulf Federal in the lease negotiation and that from 1964 through 1986 he almost exclusively did transaction law dealing mostly with real estate and some real estate leases. Mr. Mmahat acknowledged that if the bank decided to take over Occhipinti's position, it would have the obligation to pay rent. When asked by the court why paragraph 5 was placed in the amended lease agreement, he stated:
A. Well, it gave us the option to come in and take over the lease in the event that the lessee, the restaurant operator were to fail or desire not to pay the rent. We were stuck out with a loan made on the property and we wanted the option to come in and stand in the shoes so to speak which is shorthand for simply saying that we wanted to take over his position. And we wanted this in an option fashion so we could decide to do it or not. If we did it, we would get all the benefits he would have under the lease. That is mainly the right of possession. If we would option to do it, we would also of course incur all of the obligations that he had under the lease which means paying the rent, paying the taxes, paying the insurance, keeping the building in good shape, all those same things that the lessee had to do. And we wanted to be able to in fact stand in his shoes. It sounds colloquial but it has a great descriptive power to those words.
When asked if it was the bank's intention to not pay rent if the bank foreclosed and bought the property at judicial sale, in no uncertain terms Mr. Mmahat stated that the bank would have to pay rent. His response was:
A. Oh absolutely not. In fact, rent is an integral part. There can't be a lease without paying rent. You have to have consideration for it. And we at all contemplated paying the rent on the leasehold. We would in turn hopefully obtain greater rent by letting out the improvements and letting out the property but we never intended not to pay rent any more than we intended not pay fire insurance coverage, pay for the real estate, to pay for maintaining the property to keep it in shape. All those things go with the territory. That's the essence. In fact, it would have been discomforting to us not paying the rent because we could, the only way that you're assured of not being dispossessed to make sure you're paying what the landowner is required to be paid under the lease.
Edmond Miranne testified at trial as the legal representative of Bank of the South that this amendment was to induce the lender to make the loan and that the bank had the right, but not the obligation to step into the shoes of the lessee. On cross examination, he asked what his understanding was on the part of the bank to constitute stepping into lessee's shoes. His response was "I think going in and operating. They would step into the shoes of the lessee. I imagine if they went in and took over all of the rights and they advised the lessor of that and everything else." Clearly, BOL is liable for rent because they took over lessee's operation, enured to the benefits provided for under the lease but also incurred the obligations of the lease, one of which is the obligation to pay rent.

UNJUST ENRICHMENT
In their amended petition for damages, the Carrieres assert that they have a cause of action against BOL for "unjust enrichment". An action for unjust enrichment is allowed only when the plaintiff has no other remedy at law. However where there is a rule of law directed to the issue, an action must not be allowed to defeat the purpose of said rule. Taylor v. Woodpecker Corp. 562 So.2d 888 (La.1990). The basic principle behind this theory is that a plaintiff has suffered an *658 economic detriment while the defendant has received a benefit for which he has not paid. Harper v. Kennedy, 561 So.2d 830 (La.App. 2 Cir.1990). To recover, a plaintiff must show the following: enrichment on the part of the defendant; impoverishment on the part of plaintiff; casual relationship between the enrichment received by the defendant and the plaintiff's impoverishment; and a lack of other remedy at law. Edwards v. Conforto, 636 So.2d 901 (La.1993) on rehearing, and rehearing denied.
Are the five criterion for unjust enrichment present under the facts of this case? First of all, BOL has acquired the economic benefit of acquiring this property and operating it for its intended purpose. Admittedly, BOL has not paid rent to the landowners (enrichment). Secondly, because the Carrieres have not received any rental income for their property, they have been impoverished at the hands of BOL. Without any doubt, there is more than a casual relationship between BOL's enrichment and the plaintiffs' economic detriment, therefore the third element for unjust enrichment is present. Next, while BOL owns the building and improvements located on the Carrieres' separately owned land, we see no legal justification for BOL's enrichment nor plaintiff's impoverishment. Finally, we must decide whether the plaintiffs have any other remedy at law. Because we hold that the Carrieres are entitled to recover under the terms of the lease agreement, we do not rely on the doctrine of unjust enrichment.

DECREE
For the reasons assigned, the decision of the appellate court is affirmed.
RENDERED AND AFFIRMED.
CALOGERO, C.J., concurs and assigns reasons.
LEMMON, J., concurs and assigns reasons by CALOGERO, C.J.
KIMBALL, J., dissents and assigns reasons.
BLEICH, J., dissents for reasons assigned by KIMBALL, J.
CALOGERO, Chief Justice, concurring.
I agree with the majority that plaintiffs are owed compensation for the Bank's use and enjoyment of the subject property, but I do not agree with the reasoning employed by the majority to award it. The majority holds that the Bank of Louisiana "stepped into" Occhipinti's shoes by purchasing the building and Occhipinti's leasehold interest. That holding unfortunately threatens a large number of modern financing arrangements grounded in the use of leaseholds as security with the lender-friendly option of "stepping into the lessee's shoes" upon the lessee's default. That lender's option, and option it was, was never taken by the Bank of Louisiana. I would instead cast the bank for damages in unjust enrichment, based on its use and enjoyment, without right, of the subject property for the period from the Bank's foreclosure and purchase at sheriff's sale on September 20, 1989 to the Bank's purchase of the land on July 12, 1996.
It is clear that the right of occupancy may be segregated from the obligation to pay rent, and that such right may properly be sold by itself. Walker v. Dohan, 2 So. 381 (La.1887). However, that right is lost when the underlying rent obligation is unfulfilled. With all due respect to my colleague in dissent, Walker does not stand for the proposition that a naked right of occupancy in a leasehold setting may survive without satisfaction of the underlying rental obligation. In Walker, C.E. McVean & Co. held a lease of a storehouse ending September 30, 1886. Upon the death of C.E. McVean, and the insolvency and cessation of the firm, McVean's representatives sold "[t]he right of occupancy" of the leased premises from the date of the sale to the end of the lease's term. The defendant paid $50 for that "right of occupancy." The representatives paid the rent to the lessor of the property in full for the remaining lease term, then sued the purchaser of the "right of occupancy" for that amount. The Court held that the lessee had no remedy against defendants, because defendants purchased only the "right [to] occup[y]" the premises and did not expressly assume any lease obligations.
*659 The Walker Court's holding rested solely on the semantic mistake made by the representatives in selling only the "right [to] occup[y]" the premises for the remainder of the lease, rather than selling the lease itself. It had nothing to do with the right of the lessor to evict the holder of the right of occupancy. However, in dicta, the Court addresses that very issue, and cites a Mr. Hennen, "one of the most acute legal minds of his day," for the proposition that a lessee may "make a sale or donation of the right, retaining himself the obligation to pay the rent," but that the "non-fulfillment [of that obligation] might defeat the enjoyment of his vendee of the right transferred." 2 So. at 383. In other words, while a lessee may bargain away his own right to occupy the leased premises, that bargain has no effect whatsoever on the right of the lessor to evict the occupier upon the lessee's default.
Even if it were true, contrary to all logic, that a lessor could not evict one who purchases from his lessee the right to occupy the leased premises, in the instant case, Occhipinti's default caused this lease, and with it the right of occupancy, to terminate. As exemplified by the instant facts, using a lease as collateral for a mortgage is inherently dangerous for lenders: should the lessee/mortgagor default on its lease obligations and be evicted, the mortgagee is left without any collateral to secure its loan. To avoid that risk, lenders such as the Bank of Louisiana seek protective provisions in the underlying leases, such as the "step into the shoes" option in the lease at issue. In the instant case, the lessee/mortgagor Occhipinti defaulted on his lease obligations, resulting in plaintiffs' declaration on July 7, 1989 that the lease had terminated, and in plaintiffs' July 19, 1989 eviction proceeding. As correctly noted by Justice Kimball in her dissent, prior to these July, 1989 events, the Bank of Louisiana had not utilized the protective provision it bargained for with the Carrieres, i.e., it had not "stepped into" its defaulted mortgagor's shoes and expressly assumed his lease obligations. Rather, it chose to foreclose on the mortgage and sell the collateral at sheriff's sale. In so doing, the Bank of Louisiana subjected itself to the very danger it had previously sought to avoid in obtaining an option to take the lessee's place upon default: it foreclosed on a lease in which its mortgagor, the lessee, had already lost his rights. It therefore foreclosed on non-existent collateral, and the trial court's original order of eviction was correct.
From September 20, 1989 to July 12, 1996, the Bank of Louisiana occupied and enjoyed the land of the Carrieres without the right to do so.[1] The Bank should therefore compensate the Carrieres to the extent that it has been enriched, or to the extent the Carrieres have been impoverished, whichever is less. LA.CIV.CODE art. 2298; Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967); Willis v. Ventrella, 95-1669 (La. App. 1st Cir. April 4, 1996), 674 So.2d 991 (holding unjust enrichment proper where lease unenforceable). The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time judgment is rendered. LA.CIV.CODE ANN. art. 2298; Willis at 6-7, 674 So.2d at 995.
I therefore disagree with the majority's holding that the Bank "stepped into" Occhipinti's shoes and became liable for rent under Occhipinti's lease with plaintiffs. I would instead award plaintiffs quantum meruit for the Bank's use and enjoyment of the premises since its foreclosure and purchase at sheriff's sale on September 20, 1989, until the date of the Bank's purchase of the land on July 12, 1996.
*660 KIMBALL, Justice, dissenting.
I respectfully dissent.
The commercial transaction in this case involved the financing of a business venture on leased land. The right to use and enjoy the leased thing, including the right of occupancy, served as adequate collateral for the lessee to secure the substantial loan needed to make the improvements which the lessor and lessee contemplated in the lease contract. In my view, the lease clearly allowed the bank either of two choices upon the lessee's default of payment: (1) "stand in the shoes" of the lessee, or (2) sell that which was mortgaged through foreclosure proceedings. Here, the bank chose the second option.
The bank's purchase of the building and the lessee's interest in the lease did nothing to disrupt the fact that the bank purchased the right of occupancy with the obligation to pay rent remaining with the lessee. For some time, we have recognized the severability of the right of occupancy from the obligation to pay rent. Walker v. Dohan, 39 La.Ann. 743, 2 So. 381 (La.1887). As Judge Tate observed in Hollier v. Boustany, 180 So.2d 591 (La.App. 3d Cir.1965), writ refused, 248 La. 911, 182 So.2d 662 (1966), the purchase of a right of occupancy for the full remaining term of the lease, as distinguished from the purchase of a lease or the unexpired term of a lease, does not include assuming the obligation to pay rent. See also Morrison v. Faulk, 158 So.2d 837 (La.App. 4th Cir.1963), writ refused, 245 La. 643, 160 So.2d 229 (1964). Moreover, like the defendant in Walker v. Dohan, the bank cannot be held liable for obligations which it never expressly or impliedly assumed.
The concurrences contend the lessee's default of rent payment revoked the bank's right of occupancy. I disagree. In Walker, this court expressly rejected the argument that the lessee's non-fulfillment of the obligation to pay rent, when the obligation is severed from the otherwise correlative right of occupancy and enjoyment, "might defeat the enjoyment of [the] vendee of the right transferred." Walker, 2 So. at 383. Justice Fenner summarized, "They have severed the right of occupancy from the obligation of the lease, and have sold the former simply and alone." Id. (emphasis added). Consequently, I cannot agree that the bankrupt lessee's failure to pay rent disturbs the right of the leasehold interest purchaser, which purchase was made at a sheriff's sale, from enjoying the right of occupancy without the obligation of paying rent from the period of time between the 1989 sheriff's sale and the lease expiration date of October 22, 1992. The lessor's remedy in this circumstance was against Occhipinti, who unfortunately filed for bankruptcy protection in 1988.
I believe, however, that the bank's occupancy of the Carrieres' property subsequent to the date of expiration presents a wholly different problem. The record reflects that no option to extend the lease for the 1992-1997 term had been exercised, and that the lease did not otherwise remain viable after its expiration in October 1992. Therefore, after 1992 the bank's status was that of owner of an immovable separate from the land's ownership. Thus, because the lessor is unable to benefit from the lease after October 1992, the lessor is relegated to an unjust enrichment theory of recovery for the period of the bank's occupation and enjoyment of the land after the lease's expiration. The record reflects the lessor properly pleaded unjust enrichment as an alternative theory of recovery in their First Amending Petition.
Contrary to the Chief Justice's concurrence, however, I do not believe unjust enrichment is a viable remedy for the lessor based on the record evidence. In my view, all of the required elements of unjust enrichment, as articulated by the majority and expanded on by the concurrence, simply are not present in this case. One crucial elementthat there be no other remedy at lawis noticeably absent. The lessor had the right to issue a written demand under Civil Code article 493, requiring the bank to remove its building and other improvements permanently attached to the ground at the instant they believed the owner of the building no longer had the right to be on their separately owned land. If within ninety days that removal had not been achieved, the lessor would have acquired ownership of the *661 bank's separately owned building and other permanently attached improvements. This remedy at law, of which the lessor was aware, was not seized upon by the lessor.[1] It is well-settled that the subsidiary remedy of unjust enrichment requires fulfillment of the five recognized conditions in order to succeed. Edwards v. Conforto, 636 So.2d 901, 903 (La.1993). Thus, I believe the Carrieres, not having availed themselves of a remedy at lawa remedy of which they were aware are precluded from recovery on an unjust enrichment theory for the bank's occupancy of their property for the period subsequent to the lease's expiration.
This admittedly was complex and protracted litigation, with profound implications not only for the parties involved, but with ramifications far afield in the business of high finance. Based on a review of this record and the law, I must conclude that the bank's purchase of the leasehold interest at the sheriff's sale was a purchase of the right of occupancy on the lessor's land until the lease terminated or expired, with the obligation to pay rent remaining with the lessee. In addition, for the reasons stated more fully above, because the lessor has failed to satisfy all of the required elements of the subsidiary remedy of unjust enrichment for the period of occupation subsequent to the lease's expiration in October 1992, I would reverse the judgment of the court of appeal. Accordingly, I respectfully dissent.
LEMMON, Justice, concurring.
A lessee can only mortgage the lessee's rights in the lease of an immovable. La.Civ. Code art. 3286(4). At the foreclosure sale initiated by the lessee's mortgagee, the sheriff could only sell the lessee's rights in the leasethe right of occupancy of the land.[1]
Most significantly, a lessee has no right of occupancy free of the rent obligation, unless (1) the rent has been paid in full, Walker v. Dohan, 39 La.Ann. 743, 2 So. 381 (1887); or (2) the rent obligation has been merged into a judgment for rent, Ranson v. Voiron, 176 La. 718, 146 So. 681 (1933). In Walker, the lessor had been paid in full, and the lessee therefore had the right to sell the occupancy; in Ranson, the lessor had the sheriff sell the right of occupancy that the lessor owned.
Here, neither the Bank nor the lessee had paid the rent in full for the remainder of lease, as in Walker. Therefore the Bank did not acquire any right of occupancy free of the rent obligation. The right of occupancy was subject to payment by somebody of the lease rentals.
In my view, the Bank did not "step into the lessee's shoes" merely by foreclosing on the lessee's interest, and the Bank therefore did not become liable for rent over the entire term of the lease. However, the Bank, by exercising use and occupancy during the term of the lease, became obligated either to pay the rent or to have the rent paid monthly by the original lessee of the occupant. Both the Bank and the original lessee defaulted on their obligation. The Bank, having used and occupied the property for the remainder of the lease period, is liable for all unpaid rent during that period.
After the lease terminated (a date not entirely clear), the Bank apparently was a bad faith possessor and was bound under La.Civ.Code art. 486 to restore the fruits to the owner subject to the possessor's claim for reimbursement of expenses. Accordingly, the Bank is also liable for its profits derived and rents collected from the use occupancy after the termination of lease, minus the Bank's necessary expenses.

*662 ON REHEARING

KIMBALL, Justice.[*]

ISSUE
We granted the writ in this case to determine the respective rights and obligations of a lessor and the purchaser at a Sheriff's sale of the lessee's mortgaged "leasehold estate" and the improvements located thereon. Because we find the original lessee in mortgaging his "leasehold estate" mortgaged only his right of occupancy, use and enjoyment under the lease, as opposed to his entire interest in the lease, we hold that the purchaser owes no rent to the lessors under the lease. Furthermore, we find the lessors' claim for unjust enrichment is without merit (1) because there was justification under the law and under contract for the enrichment which inured to the benefit of the purchaser of the "leasehold estate" at the Sheriff's sale, and (2) because the lessors had available to them another remedy at law. Finally, because the "step in the shoes" provision in favor of the mortgagee in the lease is a separate, optional remedy for the mortgagee in the event of the lessee's default on the lease and the mortgagee herein elected to foreclose on the mortgaged collateral instead of availing itself of the "step in the shoes" provision, we hold the bank's use of the premises as a restaurant after acquiring the premises at the Sheriff's sale did not constitute a "step[ing] in[to] the shoes" of the lessee by the mortgagee under the lease. Instead, the bank's actions in operating the premises as a restaurant after acquiring the premises at the Sheriff's sale is a proper exercise of its right of occupancy, use and enjoyment under the lease. We therefore reverse the judgment of the court of appeal and dismiss plaintiffs'/lessors' case.
FACTS AND PROCEDURAL HISTORY
On April 23, 1982, plaintiffs/lessors, Richard P. Carriere and his wife, Shirley Hartmann, (hereinafter "Carrieres") owners of a commercially zoned tract of land located at 2712 N. Arnoult Road in Metairie, Louisiana, entered into a five-year ground lease with Frank Occhipinti, Inc. (hereinafter "Occhipinti"). The lease between the Carrieres and Occhipinti specifically contemplated the development of a restaurant by Occhipinti on the Carriere's land. To this end, in addition to provisions concerning lease payments, liability for taxes, and insurance requirements, provisions concerning the construction of improvements on the land by the lessee and the lessee's ownership thereof,[1] the lease contained an option in favor of the lessee to renew the lease for two consecutive five-year terms, the reversion of any improvements constructed by the lessee on the leased premises to the lessor upon termination of the lease,[2] the right of the lessee to mortgage *663 the leasehold estate,[3] an option in favor of the lessor to sell the land to the lessee, an option in favor of the lessee to purchase the land from the lessor, and liability of assignees and/or successors of the lease.[4]
After entering into the lease, Occhipinti obtained financing for the construction of his restaurant from Gulf Federal Savings and Loan Association (hereinafter "Gulf Federal") by pledging both his "leasehold estate" and the improvements which would be built with the loan proceeds on the leased land. However, before Gulf Federal would actually commit to such financing, it demanded amendments to the lease to insure its position as mortgagee would be protected. The lease was therefore amended on January 10, 1983[5] to add Gulf Federal in its capacity as "LENDER" as an intervenor in the lease, stating "[t]he parties are desirous of amending said GROUND LEASE in order to induce LENDER to finance the project and its improvements by making a loan to the LESSEE." The amendment to the lease also added the lender as an additional insured for purposes of both liability and destruction of the premises and improvements, and also added, inter alia, provisions concerning the lender's ability to exercise the lessee's rights under the lease and limitations upon the lender's obligations under the lease,[6] the lender's ability to exercise the lessee's option *664 to purchase the land, subordination of any mortgage by the lessor of the land to the mortgage of the leasehold estate, and the continued existence of the lender's mortgage until satisfied regardless of termination of the lease or a change in ownership of any improvements constructed by the lessee.[7]
After the above amendments to the lease were instituted, Gulf Federal issued the proceeds of the loan to Occhipinti and he thereafter constructed a building and parking lot on the leased premises and began operating the facility as a restaurant. In 1987 Occhipinti refinanced the loan from Gulf Federal with Bank of the South ("BOS"). As part of this refinancing, an additional amendment to the lease was made on June 26, 1987 to substitute BOS as the lender and to provide the lessee with an additional option to extend the lease for another five-year term beyond the two five-year options to extend which had been granted in the original lease. This "buyout" of Gulf Federal as the lender by BOS also explicitly incorporated all of the terms and conditions of the original lease and the prior amendments thereto. Therefore, while Occhipinti was, at the time of the refinancing, still in the last year of the original five-year term of the lease, he now had three successive options to extend the lease through October of 2002. By virtue of a subsequent merger between BOS and the Bank of Louisiana in New Orleans ("BOL"), BOL became the holder of the collateral mortgage and note given by Occhipinti and the successor in interest to BOS' position as lender under the lease.[8]
In 1988, Occhipinti filed for Chapter 11 bankruptcy, which was thereafter converted to a Chapter 7 bankruptcy proceeding on March 28, 1989. In January, 1989, Occhipinti ceased making rental payments due under the ground lease and also failed to pay the 1988 property taxes on either the land or the improvements, as required by the lease. Occhipinti also ceased making mortgage payments to BOL. In May, 1989, the trustee administering the Occhipinti bankruptcy estate rejected the ground lease and dismissed from the bankruptcy proceedings the leasehold improvements as assets of value to the bankruptcy estate. As a result of Occhipinti's failure to make the lease payments or pay the property taxes, the Carrieres issued a notice of default to Occhipinti on June 12, 1989, and, when the default was not timely cured under the terms of the lease, a notice to vacate the premises on July 7, 1989. Copies of both of these notices were sent to BOL in accordance with the terms of the lease. Thereafter, on July 19, 1989, the Carrieres filed suit to terminate the lease and evict Occhipinti from the premises. Less than a week later, on July 25, 1989, BOL filed suit for executory process, foreclosing on the Occhipinti note and collateral mortgage. At a Sheriff's sale on September 20, 1989, BOL purchased the mortgaged property, i.e., the "leasehold estate" and the improvements. The Carrieres then amended their suit for eviction to add BOL as a defendant, demanding the lease be declared terminated and the premises vacated.
On January 8, 1990, the district court rendered judgment in favor of the Carrieres, declaring the lease terminated and ordering BOL to vacate the premises. BOL appealed the judgment, claiming that as it was now the owner of the improvements constructed on the Carriere's land by Occhipinti by virtue of *665 its purchase of the improvements at the Sheriff's sale, it could not be evicted from its own property. The court of appeal agreed and, finding the lease to still be in effect, reversed the judgment of the trial court:
We hold that, as to the Bank of Louisiana, the Carrieres were not entitled to terminate the lease and evict it. However, with regard to Bank of Louisiana's argument that rejection of the lease by the trustee in bankruptcy had the effect of terminating the lease and, with it, the Carrieres' rights, we hold that the lease agreement continues in effect until it is terminated or expires....
We expressly do not rule on the ownership of the property. Disputes as to ownership of property must be adjudicated in an ordinary proceeding and not in a summary eviction proceeding. [Citation omitted]. Nor do we rule on Bank of Louisiana's mortgage rights, as evidence pertaining to that issue is not in the record. In addition, neither the right of the Carrieres to rental payments, if any, nor the right of Bank of Louisiana, if any, to exercise the option to extend the lease is before us. These are issues which must be resolved in other proceedings.
Carriere v. Frank A. Occhipinti, Inc., 570 So.2d 43, 46 (La.App. 5th Cir.1990). Though the Carrieres thereafter filed a writ application in this court, their application was denied. Carriere v. Occhipinti, 575 So.2d 392 (La.1991).
The Carrieres filed the instant suit on March 7, 1991, seeking rental payments and the payment of property taxes by BOL from the date of the foreclosure sale at which BOL had purchased Occhipinti's "leasehold estate" and the improvements. However, on BOL's motion, the trial court granted BOL summary judgment and dismissed the Carrieres' suit. On appeal by the Carrieres, the court of appeal vacated the judgment of the trial court and remanded for trial on the merits. Carriere v. Bank of Louisiana, 602 So.2d 155 (La.App. 5th Cir.1992).
After a trial on the merits, the trial court entered judgment in favor of the Carrieres in the amount of $398,032.05, representing rents and property taxes from the date of BOL's purchase of the "leasehold estate" and improvements at the Sheriff's sale, and attorney fees in the amount of $55,000.00. BOL appealed the judgment of the trial court and, on appeal, the court of appeal concluded "that the bank, by purchasing the lease and the building, and by operating the property as a restaurant, exercised its option to `step into the shoes' of the lessee" and therefore became bound as the lessee and could "no longer take advantage of those articles in the lease governing the rights of the lender." Carriere v. Bank of Louisiana In New Orleans, 95-212, p. 13 (La.App. 5th Cir. 9/26/95), 662 So.2d 491, 497. The court of appeal therefore affirmed the trial court award of damages for rents and property taxes. However, because BOL had not had an opportunity to contest the reasonableness of the attorney fees evidence, the court of appeal vacated that portion of the trial court award and remanded the matter to the trial court for consideration of the reasonableness of the attorney fees award. Id. at p. 13, 662 So.2d at 497-98. On application by BOL, we granted the writ to consider the correctness of the court of appeal's decision. Carriere v. Bank of Louisiana in New Orleans, 95-3058 (La.5/10/96), 676 So.2d 99.
Thereafter, this court rendered an opinion affirming the judgment of the court of appeal. Carriere v. Bank of Louisiana, 95-3058 (La.12/13/96), 684 So.2d 907. Upon application by BOL, we granted the instant rehearing to reexamine our initial resolution of this matter. Shirley Hartmann, Wife of/ and Richard P. Carriere, 95-3058 (La.3/07/97).

LAW
In Louisiana, a lease is a synallagmatic contract by which one party ("lessor") binds himself to grant to the other party ("lessee") the enjoyment of a thing during a certain time, for a certain stipulated price which the other party binds himself to pay. La. C.C. arts. 2669, 2674; Potter v. First Federal Savings & Loan, 615 So.2d 318, 323 (La.1993). The lessor's and lessee's duties ex contractu are set forth in the parties' contract of lease; in Title IX of the Civil Code, Of Lease, art. 2669 et seq.; and in Title III of *666 the Civil Code, Obligations in General, art. 1756 et seq. Potter, supra at 323. The Civil Code, however, while defining and governing the relationship of the parties to a lease, still leaves the parties free to contractually agree to alter or deviate from all but the most fundamental provisions of the Code which govern their lease relationship:
However, the codal articles and statutes defining the rights and obligations of lessors and lessees are not prohibitory laws which are unalterable by contractual agreement, but are simply intended to regulate the relationship between the lessor and lessee when there is no contractual stipulation imposed in the lease.
* * * * * *
Our jurisprudence is that the usual warranties and obligations imposed under the codal articles and statutes dealing with lease may be waived or otherwise provided for by contractual agreement of the parties as long as such waiver or renunciation does not affect the rights of others and is not contrary to the public good.
Tassin v. Slidell Mini-Storage, Inc., 396 So.2d 1261, 1264 (La.1981); see also T.D. Bickham Corp. v. Hebert, 432 So.2d 228 (La.1983)(upholding lessee's subordination of statutory right to maintain lease on premises after sale of land by lessor). In other words, the lease contract itself is the law between the parties; it defines their respective rights and obligations so long as the agreement does not affect the rights of others and is not contrary to the public good. La. C.C. art. 1983; Frey v. Amoco Production Co., 603 So.2d 166, 172 (La.1992); Tassin, 396 So.2d at 1264.
Along these lines, it has also been long established in Louisiana that the right of occupancy, use and enjoyment possessed by a lessee by virtue of a lease may be severed from the lessee's obligation to pay rents under the lease. See, e.g., Ranson v. Voiron, 176 La. 718, 146 So. 681 (1933); Walker v. Dohan, 39 La. Ann. 743, 2 So. 381 (1887); Hollier v. Boustany, 180 So.2d 591 (La.App. 3rd Cir.1965), writ denied, 248 La. 911, 182 So.2d 662 (1966); Morrison v. Faulk, 158 So.2d 837 (La.App. 4th Cir.1963), writ denied, 245 La. 643, 160 So.2d 229 (1964).
Finally, where the parties to a lease intend to agree that one of the parties shall subordinate one or more of his codal rights to the rights or interests of the other party, such subordination must be specific and unambiguous. T.D. Bickham, 432 So.2d at 230.
Though the right to possess, occupy or use the land of another may exist by virtue of agreement or by operation of law, it is axiomatic that one possessing, occupying or using the land of another must have a legal right of one type or the other to such possession, occupation or use. See Title II of the Civil Code, Ownership, art. 477 et seq. In this regard, though the Civil Code explicitly provides that buildings and other constructions permanently attached to the ground may belong to a person other than the owner of the ground, see La. C.C. arts. 491 and 493, the Code further provides that when such an owner no longer has the right to keep them on the land of another he must, upon written demand of the owner of the ground, remove them within 90 days after such written demand. La. C.C. art. 493. If the owner of such buildings or other constructions fails to timely remove them, the owner of the ground acquires ownership of such buildings or other constructions with no obligation to compensate the former owner. Id.
Applying the above precepts, a lessee who has availed himself of his statutory right[9] to mortgage his interests in his *667 lease may mortgage either: (1) his entire lease, which includes all of the lessee's rights, duties and obligations under the lease, including the obligation to pay rents; or (2) only his right of occupancy, use and enjoyment under the lease. If the lessee mortgages his entire lease, defaults on the mortgage, and the mortgagee forecloses, the purchaser at the Sheriff's sale becomes the owner of the lease, i.e., the lessee, and acquires all of the lessee's rights, duties and obligations under the lease, including the obligation to pay rent. As such, absent a specific and unambiguous subordination by the lessor, he acquires the original lessee's obligation to pay rents and he also acquires, in addition to the original lessee's right of occupancy, use and enjoyment, any and all other rights which the original lessee held, such as options to extend the lease and options to purchase the land from the lessor.[10] If, on the other hand, the lessee mortgages only his right of occupancy, use and enjoyment, defaults on the mortgage, and the mortgagee forecloses, the purchaser at the Sheriff's sale becomes the owner of only the original lessee's right of occupancy, use and enjoyment under the lease, while the original lessee/mortgagor retains the obligation to pay rents. If, in this situation, the original lessee/mortgagor also defaults on his obligation to pay rents, the owner of the right of occupancy, use and enjoyment, absent a specific and unambiguous subordination in favor of such an acquirer by the lessor, may, should the lessor thereafter cause the lease to be terminated for the original lessee's non-payment of rents, lose his right to remain on the leased premises.[11] In this situation, if there are also improvements on the land which were owned by the original lessee/mortgagor that are now, by virtue of the original lessee/mortgagor's default and the subsequent foreclosure and sale, owned by the purchaser at the Sheriff's sale, the lessor will be free, in accordance with La. C.C. art. 493, to demand, in addition to the purchaser's vacation of the land, removal of such improvements within ninety days.[12]

*668 DISCUSSION
In the instant suit, the Carrieres, as landowners and lessors, maintain the prior suit between themselves and BOL resulted in a final judgment that the lease is still in effect. As such, the Carrieres argue BOL, by virtue of its actions in occupying the leased premises after acquiring the collateral mortgaged by Occhipinti at the Sheriff's sale, has exercised its right under the lease to "step in the shoes" of Occhipinti, has thereby become the lessee, and is now responsible for rents and taxes under the lease. Alternatively, the Carrieres maintain they are, in any event, entitled to an award in unjust enrichment for BOL's rent-free occupation of their land.
In contrast, BOL first asserts that the court of appeal's statements in the prior suit between the Carrieres and BOL that the lease is still in effect are mere dicta, such that this court must now pass on BOL's contentions that the lease was either terminated prior to foreclosure by virtue of the Carrieres' letters to Occhipinti regarding default and termination or by the trustee's rejection of the lease in Occhipinti's bankruptcy, or was terminated by virtue of the foreclosure itself. Alternatively, BOL maintains that as only a right of occupancy, use or enjoyment was mortgaged by Occhipinti and therefore acquired by BOL at the Sheriff's sale, it has no obligation under the lease to pay rents to the Carrieres. BOL also asserts that the "step in the shoes" provision in the lease is optional, not mandatory, and that as it never exercised its option under the lease to "step in the shoes" of Occhipinti, it does not owe rents to the Carrieres pursuant to that provision of the lease. Finally, BOL maintains that as the Carrieres cannot meet the requirements for an award in unjust enrichment and, further, that as BOL has not been unjustly enriched in any event, no such award is warranted.

The Prior Suit
In the instant case, the court of appeal found its prior decision in the previous suit between these parties to be "law of the case" as to the issue of the existence of the lease after BOL's foreclosure and subsequent purchase at the Sheriff's sale. Carriere, 662 So.2d at 496. BOL maintains this is error in that the court of appeal's decision in the previous case regarding the continued existence of the lease is obiter dicta. Instead, BOL maintains, the trial court's judgment in the previous suit which declared the lease terminated was never properly before the court of appeal, as only BOL appealed the trial court's decision and BOL did not assign as error the trial court's decision that the lease was terminated. BOL therefore re-asserts in this court arguments made in the previous suit and in the instant suit, i.e., that the lease between Occhipinti and the Carrieres was terminated by either: (1) the letters of default and termination sent by the Carrieres to Occhipinti in, respectively, June and July of 1989, prior to BOL's foreclosure; (2) the bankruptcy trustee's rejection of the lease as an asset of Occhipinti's bankruptcy estate, prior to BOL's foreclosure; or (3) BOL's foreclosure and the subsequent Sheriff's sale.[13] However, a review of the pleadings in the previous suit convinces us that the court of appeal properly considered and decided the issue of the existence of the lease in that suit and, upon the denial by this court of the Carrieres' writ application, Carriere, 575 So.2d at 392, the court of appeal's decision became a final judgment.
In the previous suit, the Carrieres filed a "Petition To Terminate Lease and for Possession of Premises" against Occhipinti, seeking termination of the lease and eviction of Occhipinti from the premises. After BOL filed suit for executory process against Occhipinti, *669 foreclosed on the mortgage, and purchased the collateral at the Sheriff's sale, the Carrieres amended their petition to name BOL as an additional defendant as BOL was now the owner of Occhipinti's interest and the occupier of the premises. After trial on the merits the trial court rendered judgment in favor of the Carrieres, declaring the lease terminated and ordering BOL to vacate the premises. BOL appealed the judgment, asserting in the court of appeal that the trial court had erred in not declaring the lease terminated prior to the foreclosure by virtue of either the Carrieres' letters of default and termination to Occhipinti or the bankruptcy trustee's rejection of the lease as an asset of the bankruptcy estate. In addition, BOL asserted the Carrieres had been estopped by deed, i.e., by the lease terms and covenants, from evicting BOL, and that the Carrieres had waived and subordinated any right they had under the lease to collect rents from BOL or hold BOL liable for any obligations under the lease. Based on these pleadings, the pleadings in the trial court below, and the issues actually litigated in the trial court below, the court of appeal found:
The only issue raised by the Carrieres in their pleadings and in the judgment was their right, as lessors, to terminate the lease and evict Occhipinti and/or its successor, Bank of Louisiana. The ownership of the improvements and the rights of the mortgagee were never at issue and were in fact not adjudicated at trial, and the mortgage itself is not in evidence.
The lease contract is the law between the parties. Bank of Louisiana's rights to possession, if any, must flow from that lease agreement and its amendments.
Carriere, 570 So.2d at 44.
After reviewing the lease, its amendments, and the record below, the court of appeal stated:
We hold that, as to the Bank of Louisiana, the Carrieres were not entitled to terminate the lease and evict it. However, with regard to Bank of Louisiana's argument that rejection of the lease by the trustee in bankruptcy had the effect of terminating the lease and, with it, the Carrieres' rights, we hold that the lease agreement continues in effect until it is terminated or expires....
We expressly do not rule on the ownership of the property. Disputes as to ownership of property must be adjudicated in an ordinary proceeding and not in a summary eviction proceeding. [Citation omitted]. Nor do we rule on Bank of Louisiana's mortgage rights, as evidence pertaining to that issue is not in the record. In addition, neither the right of the Carrieres to rental payments, if any, nor the right of the Bank of Louisiana to exercise the option to extend the lease is before us. These are issues which must be resolved in other proceedings.
Carriere, 570 So.2d at 46. Thereafter, the Carrieres' writ application in this court was denied. Carriere, 575 So.2d at 392.
After considering the pleadings filed in the previous suit and the court of appeal's decision, we find the court of appeal properly considered the existence of the lease to be at issue in BOL's appeal of the trial court's judgment terminating the lease and ordering BOL to vacate the premises. We also find the court of appeal considered and thereafter rejected BOL's contentions that the lease had been terminated by virtue of either the Carrieres' letters of default and termination to Occhipinti, the bankruptcy trustee's rejection of the lease and improvements as assets of the bankruptcy estate, or BOL's foreclosure. As such, the judgment of the court of appeal holding "the lease agreement continues in effect until it terminates or expires," Carriere, 570 So.2d at 46, constitutes a final judgment as to these matters, and they cannot now be re-litigated in the instant case.

The Mortgage: Right of Occupancy or Entire Interest in Lease
Though the court of appeal decided in the previous suit that the lease agreement continued in effect, and we have decided herein the court of appeal's decision constitutes a final judgment as to that issue, that decision does not resolve the primary issue raised in this case, i.e., does BOL owe the Carrieres rents for its occupation of the Carrieres' land. Occhipinti ceased making rental payments in January of 1989. BOL purchased the collateral which Occhipinti had *670 mortgaged on September 20, 1989 at the Sheriff's sale. Regarding any liability for rental payments which BOL may have had as mortgagee during that time period for rental payments, the lease specifically addresses this issue and states:
(E) No liability for the payment of the rental or the performance of any of LESSEE's covenants and agreements hereunder shall attach to or be imposed upon any mortgagee or holder of any indebtedness secured by any mortgage upon the leasehold estate, all such liability being hereby expressly waived by LESSOR.
Thus, BOL is clearly not liable as mortgagee for rental payments which Occhipinti failed to make from January of 1989 until September 20, 1989.
We turn now to the issue of whether or not BOL, as the third party purchaser at a Sheriff's sale of the mortgaged "leasehold estate" and improvements located thereon, is liable to the Carrieres for rental payments which Occhipinti failed to pay subsequent to September 20, 1989. Resolution of this issue requires a determination not made in the previous suit or in the instant suit in the courts below as to what, exactly, was mortgaged by Occhipinti. BOL could not acquire anything more at the Sheriff's sale than that which was mortgaged by Occhipinti. As a result, depending on the nature of the collateral mortgaged and thereafter acquired by BOL, the lease continued in effect after the judgment in the previous suit with either Occhipinti retaining the obligation to pay the Carrieres rents under the lease, or BOL, by virtue of its acquisition of the collateral at the Sheriff's sale, also acquiring the obligation to pay the Carrieres rents under the lease.
In the June 26, 1987 mortgage to BOS, Occhipinti mortgaged "THAT LEASEHOLD ESTATE created and existing by virtue of a Ground Lease by and between ... [the Carrieres and Occhipinti]." Beyond this initial description of that which is mortgaged, the mortgage goes on to declare:
All rights, duties and obligations of the mortgagor and mortgagee as provided for in the Ground Lease dated Aril 23, 1982, between Shirley Hartman, wife of/and Richard P. Carriere, lessors and Frank A. Occhipinti, Inc., Lessee registered at COB 1029, Folio 580 in the Parish of Jefferson, State of Louisiana and the amendments to Ground Lease are incorporated into and made part of this act of Mortgage as if copied herein in extenso for all purposes. (Emphasis added).
Although the parties failed to describe that which was mortgaged as "THAT RIGHT OF OCCUPANCY, USE AND ENJOYMENT created and existing by virtue of a Ground Lease by and between" the Carrieres and Occhipinti, they nevertheless explicitly chose to describe that which was mortgaged as something other than Occhipinti's entire lease, instead describing it as "THAT LEASEHOLD ESTATE created and existing by virtue of a Ground Lease." Notably, Occhipinti did not mortgage "THAT GROUND LEASE by and between [the Carrieres and Occhipinti]."
First, we are unwilling to impose a requirement that, as a matter of law, only by the use of the phrase "THAT RIGHT OF OCCUPANCY, USE AND ENJOYMENT" may the parties to a mortgage create a mortgage of less than the entire interest of the lessee. Second, in our view, the mortgage at issue herein, in using the phrase "THAT LEASEHOLD ESTATE created and existing by virtue of a Ground Lease," neither explicitly states nor reasonably implies that a mortgage of Occhipinti's entire lease is intended or even contemplated by the parties. Instead, we conclude the use of the phrase "leasehold estate" as opposed to "THAT GROUND LEASE" or "THE LEASE" or "THE ENTIRE LEASE" connotes a mortgage of something less than Occhipinti's entire interest in the lease is being mortgaged.
Further, the additional mortgage paragraph quoted, supra, does nothing more than incorporate into the mortgage the rights, duties and obligations of the mortgagee and mortgagor, visa-vis each other, contained in the lease and its amendments. In addition, this conclusion is supported by Paragraph 15 of the first amendment to the lease, which amended Paragraph 19 of the original lease. The amendment, in pertinent part, states:

*671 The parties agree, however, that any leasehold mortgage to LENDER shall require the LESSEE pledge and mortgage all rights and title it may have to the premises and to its leasehold interest and allow said LENDER to exercise all of LESSEE's rights, to stand in LESSEE's place, and to take over from LESSEE in the event of either a default on said indebtedness or if in the opinion of LESSEE it must act to protect its interests in the leasehold. Nothing contained in this article or in any other part of the lease shall operate to prevent the LENDER from so exercising its right to protect its security interests in the premises.
This carefully drafted amendment requires the lessee to mortgage all of his rights to the lender under any leasehold mortgage, but omits reference to lessee's obligations under the lease. As the lender consistently required throughout the lease, however, the lease also explicitly states that "[n]othing contained in this article or in any other part of the lease" would operate to prevent the lender from electing to foreclose on the collateral.
We therefore hold the use of the phrase "THAT LEASEHOLD ESTATE created and existing by virtue of a Ground Lease" in the description of that which was mortgaged creates a mortgage by Occhipinti of only his right of occupancy, use and enjoyment. As such, BOL, when it purchased Occhipinti's mortgaged collateral at the Sheriff's sale following foreclosure, acquired ownership only of the building and other constructions on the leased premises and Occhipinti's right of occupancy, use and enjoyment under the lease with the Carrieres. The obligation to pay the Carrieres rents under the lease therefore remained with Occhipinti, and the Carrieres cannot now recover rents under the lease from BOL, the third party purchaser at a Sheriff's sale of the mortgaged collateral.

Unjust Enrichment
The Carrieres argue they are entitled to an award in unjust enrichment for BOL's rent-free occupation of their land. Prior to the enactment of La. C.C. art. 2298 (Acts 199, No. 1041, § 1, effective January 1, 1996), this court held on several occasions that the five requirements for a showing of unjust enrichment or action de in rem verso are: (1) there must be an enrichment; (2) there must be an impoverishment; (3) there must be a connection between the enrichment and the resulting impoverishment; (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment; and (5) there must be no other remedy at law available to plaintiff. See, e.g., Baker v. Maclay Properties Co., 94-1529, p. 18 (La.1/17/95), 648 So.2d 888, 897, and cases cited therein. The legislature, subsequent to our decision, codified the remedy of unjust enrichment by enacting La. C.C. art. 2298, and it is clear from the language of that article that unjust enrichment under Article 2298 is, as it always has been under our decisions, a "subsidiary remedy." See La. C.C. art. 2298[14]
In the instant case, the Carrieres are not entitled to recover rental payments and property taxes from BOL under the theory of unjust enrichment because BOL's "enrichment" and the Carrieres' "impoverishment" were not "without cause" under Article 2298 and our case law. By its very terms, Article 2298 excludes from recovery those cases wherein the "enrichment results from a valid juridical act or the law." Likewise, prior to the adoption of this Article, this court stated repeatedly that one of the prerequisites for recovery under the theory of unjust enrichment was an absence of justification or cause for the enrichment or impoverishment. "[O]nly the unjust enrichment for which there is no justification in law or contract allows equity a role in the adjudication." Edmonston v. A-Second Mortgage Co. of Slidell, Inc., 289 So.2d 116, 122 (La.1974). *672 See also Edwards v. Conforto, 636 So.2d 901, 907 (La.1993).
Although there was arguably an enrichment on the part of BOL and an impoverishment on the part of the Carrieres, it was one justified under the law. As previously explained, when BOL purchased Occhipinti's mortgaged collateral at the Sheriff's sale following foreclosure, it acquired ownership only of the building and other constructions on the leased premises and Occhipinti's right of occupancy, use and enjoyment under the lease with the Carrieres. The obligation to pay the Carrieres rents under the lease therefore remained with Occhipinti. By operation of law, BOL has never been legally obligated to pay the Carrieres rental payments and property taxes and was legally entitled and, indeed, intended, as purchaser of the mortgaged collateral, to receive the "enrichment" resulting from its purchase of Occhipinti's "leasehold estate" without the attendant obligation to pay rents.
Not only was there justification in the law that BOL be enriched by not having the obligation to make rental payments, but there is also justification for such result in "a valid juridical act" as referred to by Article 2298 and signed by the Carrieres. The Carrieres agreed to, and the lease itself authorized, the mortgage of the "leasehold estate," which we have explained constitutes a mortgage of only the right of occupancy, use and enjoyment possessed by the lessee by virtue of the lease and does not include the lessee's obligation to pay rents under the lease. There can be no dispute that the very essence of a mortgage is that upon the failure of the obligor [Occhipinti] to perform the obligation that the mortgage secures [making loan payments to the mortgagee], the mortgagee has the right to "cause the property to be seized and sold in the manner provided by law and to have the proceeds applied toward the satisfaction of the obligation in preference to claims of others". La. C.C. art. 3279. The Carrieres should have contemplated that their agreement in the lease to allow Occhipinti to mortgage the "leasehold estate" included the possibility that Occhipinti would fail to make the loan payments, the mortgagee would foreclose on the mortgaged property securing the loan, and a third party would purchase the "leasehold estate" or right of occupancy, use and enjoyment at a Sheriff's sale without having the obligation to pay rents. Indeed, it was intended that such a result occur should there be a foreclosure. The Carrieres' impoverishment in this case resulted from Occhipinti's failure to pay them rental payments and the taxes on the property, not from any action by BOL as third party purchaser of the mortgaged collateral.
It is well-settled that the subsidiary remedy of unjust enrichment requires fulfillment of all five of the recognized conditions in order to succeed. Edwards, 636 So.2d at 903. However, in addition to there being "justification" or "cause" for the enrichment and the impoverishment which precludes the application of unjust enrichment in this case, we note there was another remedy at law available to plaintiff which was to proceed against Occhipinti for his failure to pay rent. Irrespective of whether or not there is a judgment terminating the lease, a lessor can still file a suit against a lessee on the lease contract seeking past rental payments due. This action prescribes in three years under La. C.C. art. 3494. The Carrieres had a remedy under the law for their impoverishment and that remedy was pursuing an action against the person liable to them under the law for the rental payments Occhipinti. Whether or not they could have been successful in that action because of Occhipinti's bankruptcy is not a factor which should considered with respect to the third party purchaser of the "leasehold estate" who acquired that "leasehold estate" at a Sheriff's sale without the attendant obligation to pay rent. The existence of a "remedy" which precludes application of unjust enrichment does not connote the ability to recoup your impoverishment by bringing an action against a solvent person. It merely connotes the ability to bring the action or seek the remedy. That the party whom the Carrieres authorized in the lease to mortgage only the right of occupancy, use and enjoyment while retaining the obligation to pay rent might file for bankruptcy and be unable to make rental payments is a risk attendant to every business transaction, and the impoverishment to the Carrieres which *673 resulted therefrom does not justify a finding that BOL was unjustly enriched.
The record reflects that no option to extend the lease for the 1992-1997 term had been exercised, and that the lease did not otherwise remain viable after its expiration in October 1992. The Carrieres are not entitled to rental payments from BOL for the period of time prior to October 1992 for the aforementioned reasons. After the lease terminated, the bank's status was that of owner of an immovable separate from the land's ownership. It no longer enjoyed the right of occupancy, use and enjoyment under the lease because the lease no longer existed. The Carrieres are not entitled to unjust enrichment resulting from BOL's rent-free occupation of the buildings on their property after October 1992 because there existed another remedy at law available to plaintiff which would have terminated BOL's enrichment and the Carrieres' impoverishment. The Carrieres had the right to issue a written demand under La. C.C. art. 493, requiring the bank to remove its building and other improvements permanently attached to the ground at the instant they believed the owner of the building no longer had the right to be on their separately owned land. If within ninety days that removal had not been achieved, the lessor would have acquired ownership of the bank's separately owned building and other permanently attached improvements. This remedy at law was not seized upon by the lessor. Thus, the Carrieres, not having availed themselves of a remedy at law are precluded from recovery on an unjust enrichment theory for the bank's occupancy of their property for the period subsequent to the lease's expiration.

The "Step In The Shoes" Provision of the Lease
Finally, though the court of appeal in the instant case failed to specifically address the nature of the collateral mortgaged by Occhipinti and, hence, the nature of BOL's occupancy of the Carrieres' land, the court nevertheless held that BOL, after acquiring the leasehold estate and improvements at the Sheriff's sale, had tacitly availed itself of the "step in the shoes" provision of the lease and had therefore become the lessee, such that it was now obligated as the lessee under the lease to pay the Carrieres rents. Carriere, 95-212 at 13, 662 So.2d at 497. More specifically, the court of appeal found BOL's actions in operating the premises as a restaurant after acquiring the leasehold estate and improvements constituted an exercise by BOL of the "step in the shoes" option contained in the lease. Id. We disagree.
The "step in the shoes" provision contained in the lease is optional on the part of the lender, not mandatory, and under the explicit terms of the lease exists as an entirely separate remedy from foreclosure as an available alternative for the lender in the event of a default under the lease by the lessee. As such, in the event of a default on the part of the lessee such as, in the instant case, a failure to pay rents, the lender had the option under the lease to either "step in the shoes" of the lessee or to foreclose on its collateral. In the instant case, BOL, as lender, elected to foreclose on its collateral and later acquired that collateral at the Sheriff's sale. As previously determined herein, the collateral acquired by BOL at the Sheriff's sale was Occhipinti's right of occupancy, use and enjoyment under the lease, along with the improvements constructed on the leased premises by Occhipinti. Therefore, BOL, in operating the building it now owned as a restaurant on premises on which it had a legal right to occupy, did not thereby "step in the shoes" of the lessee. Instead, BOL was appropriately exercising its right to occupy the leased premises, with Occhipinti retaining the obligation to pay rents.

CONCLUSION
Under the specific mortgage at issue in this case, we find the original lessee, Occhipinti, mortgaged to BOS only his right of occupancy, use and enjoyment under his lease with the Carrieres. As such, when BOL, as successor to BOS's interest, foreclosed upon the mortgage and subsequently acquired the collateral at the Sheriff's sale, it acquired only Occhipinti's right to occupy, use and enjoy the leased premises, along with the improvements constructed by Occhipinti *674 on the leased premises, with Occhipinti retaining the obligation under the lease to pay rents to the Carrieres. As such, BOL does not owe the Carrieres rents while it possessed the premises.
Further, because there was justification under the law and under contract for the enrichment which inured to the benefit of the purchaser of the "leasehold estate" at the Sheriff's sale, and because the lessors had available to them another remedy at law, the Carrieres' claim for unjust enrichment is without merit. Finally, BOL's operation of the premises as a restaurant after acquiring the leasehold estate and improvements at the Sheriff's sale did not constitute a "step[ping] in[to] the shoes" of the lessee by BOL under the lease. Instead, BOL, as the owner of the improvements and Occhipinti's right of occupancy, use and enjoyment under the lease, was free to use the premises as a restaurant so long as the lease remained in effect.
REVERSED.
CALOGERO, C.J., and LEMMON, J., concur and assign reasons.
KNOLL and JOHNSON, JJ., dissent and assign reasons.
CALOGERO, Chief Justice, concurring.
When this case was before us on original hearing, the majority held that the Carrieres were entitled to recover under the terms of the lease agreement because BOL had "stepped into the shoes" of the lessee, thereby obviating the issue of whether the Carrieres could have recovered under a theory of unjust enrichment. I concurred in the original opinion because I agreed that the plaintiffs were entitled to recovery, but I concluded that the basis of that recovery was unjust enrichment, not the terms of the lease agreement as the majority held.
On rehearing, however, the opinion presents an in depth analysis of the unjust enrichment issue, and this analysis has prompted me to side with this majority. Unjust enrichment is an available recourse provided that all five of the following requirements are met: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification of cause for the enrichment and the impoverishment; and (5) no other remedy at law available to the plaintiff. Failure to satisfy any one of these criteria will preclude recovery. I now believe that there was justification both under the law and the contract of lease for the enrichment which enured to the benefit of the purchaser of the leasehold estate at the sheriff's sale. The plaintiffs therefore have not satisfied the fourth criterion. I am not sure that I agree with the majority's assertion that the fifth criterion was also not satisfied. However, this concern of mine is irrelevant as there existed a justification or cause for the enrichment and corresponding impoverishment, and that in itself is enough to bar their recovery under unjust enrichment.
Therefore, upon further consideration, while unjust enrichment initially seemed a viable remedy for the plaintiffs, I must now concede that the majority is correct that it is not, and for this reason I concur.
LEMMON, Justice, concurring.
The critical issue in this case is whether amended Paragraph 8[1] of the lease, which as *675 originally written merely overrode statutory provisions regarding ownership of improvements, constituted a subordination agreement by which the lessors agreed to subordinate their rights under the lease (including the right to collect rent) to the Bank's right to full payment of the mortgage indebtedness.
Generally, priorities between leases and mortgages depend upon the order of recordation, but priorities can be changed by a subordination agreement. 2 Grant S. Nelson & Dale A. Whitman, Real Estate Finance Law § 12.9 (3d ed.1994). When it is advantageous to do so (as, for example, to induce a lender to provide construction financing to a desirable lessee), the lessor in a recorded lease may agree to subordinate the lease to a future mortgage that is necessary for the lessee to construct improvements on the leased property. However, the lessor who thus alters his or her priority position must do so with the realization that it may become necessary to pay off the mortgage in order to regain the rights to the land if the lessee defaults on the mortgage.
In the present case, when Occhipinti defaulted on the mortgage payments and the Bank acquired by foreclosure Occhipinti's building and Occhipinti's leasehold interest in the land, the Bank had the right to occupy the property, and Occhipinti had the separate obligation under the lease to pay rent. However, in the absence of a subordination agreement, the Bank could occupy the property only as long as someone paid the rent, and the Bank would have had to pay the rent in order to preserve its right of occupancy; otherwise, the lessors could terminate the lease and exercise their ninety-day notice rights under La. Civ.Code art. 493 to require removal of the improvements or to acquire ownership thereof.
The amended Paragraph 8 was a subordination agreement.[2] If the lessors, when neither Occhipinti nor the Bank made payments due under the lease after September 1989, had issued a ninety-day letter under Article 493, the Bank still had its rights under the Paragraph 8 subordination provision to full payment of the indebtedness secured by the mortgage, minus the amount credited in the foreclosure sale. The Bank's foreclosure extinguished its rights under the mortgage against Occhipinti, the owner of the building and the leasehold interest, but did not extinguish the right to full payment of the indebtedness that the Bank contractually extracted from the lessors in consideration for extending credit to the lessee to improve the lessors' property.
While the lessors suggest that Bank's foreclosure somehow relieved them of their obligation under the lease to which the Bank was a party, the Bank's exercising its rights to foreclose and acquire ownership at the sheriff's sale of Occhipinti's leasehold interest and Occhipinti's building did not cancel or impair the Bank's real rights under the subordination agreement. The foreclosure did not extinguish the underlying indebtedness to which the lessors subordinated their reversionary rights under the lease. The result of the Bank's becoming an owner of the building situated on the lessor's land, however, was significant in that it re-triggered the applicability of La. Civ.Code art. 493. However, the lessors and Occhipinti had expressly altered Article 493's usual result by providing in the original Paragraph 8 that full ownership of the building Occhipinti constructed with the lessors' consent would revert to the lessors on termination of the lease. Moreover, the crucial amendment to Paragraph 8 of the lease had added the subordination provision by which the lessors agreed that their contractual reversion rights would be primed by the Bank's rights to full *676 payment of the indebtedness.[3] By contracting to amend Paragraph 8, the lessors altered their rights that would have flowed from Article 493. As a result of this amendment, the lessors could not exercise any rights otherwise available under Article 493, inasmuch as they had agreed that the improvements would remain subject to the contractual provision requiring full payment of the indebtedness to the Bank.
I therefore concur in the dismissal.
KNOLL, Justice, dissenting.
The majority holds that the use of "That Leasehold Estate," when construed with other provisions in the mortgage, unambiguously created only a mortgage of the right of "Occupancy, Use and Enjoyment" under the lease, with none of the attendant obligations. The majority then concludes BOL purchased only the right of "Occupancy, Use and Enjoyment" at the sheriff's sale, while the obligation to pay rent remained with the bankrupt Occhipinti.
While I agree in theory, that the right to occupy property under a lease is severable from the obligation to pay rent, I respectfully disagree with the majority's conclusion that the parties to this mortgage in fact separated these elements of lease, and included only the rights of "Occupancy, Use and Enjoyment" in the mortgage. I find that the separation of the rights and obligations under a lase is a rare an archaic situation which should arise only when explicitly provided by the parties.
I find no support in the record for the proposition the proposition that the term "That Leasehold Estate" included only the benefits flowing from the lease without any of the attendant obligations. In the case sub judice, the parties to the mortgage made absolutely no mention that less than the full lease was subject to the mortgage. In fact, and as noted in the majority opinion, the parties to the mortgage expressly incorporated "[a]ll rights, duties and obligations of the mortgagor [Occhipinti] and mortgagee [BOL] as provided for in the Ground Lease ... and the amendments to the ground lease ... as if copied herein in extenso for all purposes." Since all duties and obligations of Occhipinti under the ground lease were expressly incorporated into the mortgage for all purposes, it is unreasonable to imply that the obligation to pay rent was impliedly excluded because of the description of the mortgaged right as "That Leasehold Estate" rather than "That Ground Lease."
In Blacks Law Dictionary, a "Leasehold" is defined as an "estate in real property held by lessee/tenant under a lease.... The asset representing the right of the lessee to use the leased property." In the case sub judice, the "asset representing the right of the lessee to use the leased property" is the lease itself. The "estate in real property" held by the lessee "under the lease" is his right to use the property conditioned on the payment of rent. The "Leasehold Estate" exists only by virtue of the ground lease, which necessarily includes the performance of the lessee's obligations. See La.Civ.Code art. 2710.
The simple realities of the creditor /debtor relationship also demand that the entire lease be mortgaged. It is only reasonable to assume that a debtor who cannot make the payments of interest and principal to his creditor will likewise be unable to make his rent payment to the lessee. In such a situation, if the only collateral securing the indebtedness is a mortgage on the right of "Occupancy, Use and Enjoyment," then these rights would be void for nonpayment of rent contemporaneous to the lender's foreclosure on the mortgage. These rights would be worthless as collateral.
In the instant case, BOL was financing a construction loan on property that was not owned by the debtor. Therefore, BOL took a mortgage on the separately owned building, and a mortgage on the only thing that allowed the building to be separately owned from the land, namely the lease. The mortgage on the lease was the only way BOL could protect its investment in the building, since without the lease, BOL would have to *677 removed its building, presumably with a significant loss in its value as collateral.
When Occhipinti did in fact default, BOL successfully argued that it could not be evicted since the lease was still in effect. Now, in this subsequent suit for rent under the terms of the existing lease, BOL conveniently asserts that it only foreclosed on a right of occupancy, and that it has been justifiably occupying the property rent free, since the lessors have not yet sued the bankrupt Occhipinti for termination of the lease. BOL is playing a game of "hide the ball" in the courts, and has only asserted this arcane division of rights and obligations under the lease in order to recoup some of the losses from an ill-advised loan by avoiding rent rightfully owed to lessors.
I find that BOL purchased the entire lase at the sheriff's sale, along with all rights and obligations. When it foreclosed on the mortgage and purchased the collateral at the sheriff's sale, it no longer held the position of "lender" under the lease, but by purchasing all rights and obligations formerly held by Occhipinti, it succeeded Occhipinti as "lessee." Although BOL did not "step into the shoes" under the terms of the lease itself, by purchasing all the lessee's interest and by occupying the leased premises, it effectively became the lessee. Therefore I find that BOL should be held liable for the rent provided in the lease.
JOHNSON, Justice, dissenting.
The Carrieres have been attempting since 1989 to collect rents and taxes on this property which is located at 2712 N. Arnoult Road in Metairie, Louisiana. During this entire time, Occhipinti and later BOL has had the use and occupancy of the property and even collected rents. The plaintiffs issued a notice of default to Occhipinti, on June 12, 1989, and when the default was not cured, a notice to vacate the premises was issued on July 7, 1989. The plaintiffs then filed suit to terminate the lease and evict Occhipinti from the premises.
Following the purchase of the "leasehold" by BOL at the Sheriff's sale, the Carrieres added the bank as a defendant in the suit for eviction. In Carriere I, the district court declared the lease terminated and ordered the bank to vacate the premises. The appellate court then reversed, finding the lease to still be in effect, and this court denied writs.
The majority of this court has now told the Carrieres they should not have relied on the "law of the case" principle, but instead were required to file a new lawsuit against the bank to terminate the lease, or issue a demand letter to vacate under civil code article 493. What is a litigant to do if he has a judgment in hand and cannot rely on it?
For these reasons, in addition to those expressed in our original opinion, I respectfully dissent.
NOTES
[*] Marcus, J. not on panel. Rule IV, Part 2, § 3.
[1] The bankruptcy trustee filed a petition of disclaimer and abandonment on May 3, 1989 and an order approving his action was signed on that date.
[2] Paragraph 5 of the original lease entitled LESSEE'S COVENANTS, in part states:

(B) To bear, pay and discharge all future real estate taxes, charged or imposed, upon the demised premises or any improvements erected thereon by occupier in respect thereof during the term of this Lease and any extensions thereof, and to promptly deliver to the LESSOR at all times proper and sufficient receipts and other evidence of the payment and discharge of the same. LESSEE'S obligations hereunder shall be only to the extent of actual occupancy, its being agreed that the taxes for the beginning and the end of the term shall be prorated.
[3] Plaintiff's filed a supplemental and amending petition which was filed on September 28, 1989 wherein paragraph II states: "Petitioners further show that the said BANK OF LOUISIANA IN NEW ORLEANS shall now be made a party defendant to these proceedings."
[4] La.C.C. Art. 491.
[5] See Black's Law Dictionary Sixth Edition, at 890.
[6] The trial judge presiding over Ergon was E.J. Bleich, J. Since that time, Bleich, J. was elected to the Louisiana Supreme Court and is on the panel deciding this matter.
[7] The author of the appellate court's opinion was J. Victory. Since that time, J. Victory was elected to the Louisiana Supreme Court and is on the panel deciding this case.
[8] Their petition was filed on July 25, 1989. The parties to this proceeding were Frank A. Occhipinti, Inc. who was named defendant, and BOL as petitioner.
[9] Carriere v. Bank of La. in New Orleans, supra at 497.
[10] See La.C.C. article 1903.
[11] La.C.C. art. 2669.
[12] La.C.C. art. 2045.
[1] Even the dissent would have to acknowledge that the Bank had no right to occupy these premises after October 23, 1992, for on that date there expired the five-year option taken by Occhipinti on October 23, 1987. Upon the lease term's expiration, the right of occupancy ceded to the Bank by the dissent ceased. To hold otherwise would be to hold that a party like the Bank of Louisiana may perpetually occupy and enjoy another's property without any underlying right to do so. That clearly illogical result is not mitigated by this particular Bank's purchase of this particular land on July 12, 1996. Even had it not purchased the land, the dissent would apparently have no difficulty allowing the Bank to remain on the Carrieres' land forever, as it expresses no outside limits whatsoever on the Bank's alleged right to occupy these premises.
[1] The Carrieres' attorney, Clarence F. Favret, III, made the following argument on the article 493 issue before the trial judge:

Our simple allegation is that the Fifth Circuit held the lease is in effect and continues into [sic] effect until terminated or it expires; that the bank is the owner of the building on the land owned by the Carrieres. The lease is in effect as found by the Fifth Circuit, so rent is due. That it's illogical for the bank to take the position that the lease is terminated.... And... if they say that, then the law is very clear, Louisiana law by Codal provision, they have ninety days, we can require them to remove their building or leave in ninety days so if they want to take that position and put it on the record, then that's fine because we'll give them a ninety day letter.
(R. p. 12) (emphasis added).
[1] The sheriff also sold the building that had been constructed by the lessee upon the leased land.
[*] Marcus, J., not on panel. See Rule IV, Part 2, Section 3.
[1] The lease, in pertinent part, contained the following provisions regarding the lessee's construction and ownership of improvements on the leased land:

2. CONSTRUCTION OF IMPROVEMENTS: LESSEE anticipates constructing at its sole cost and expense, improvements to include a building, driveways and parking area (herein referred to as "Improvements") in accordance with the Plans and Specifications annexed hereto....
* * * * * *
8. RIGHT TO MAKE ALTERATIONS, TITLE TO AND REMOVAL OF IMPROVEMENTS: LESSEE may make or permit any Subleasee (sic) to make alterations, additions and improvements to the demised premises from time to time and all of such alterations, additions and improvements, including those which may be constructed by LESSEE in accordance with Paragraph 2 hereof, shall be and remain the property of the LESSEE or Sublessee, as the case may be, at all times during the term of this Lease and any extensions or renewals thereof....
[2] The lease contained, in pertinent part, the following provisions concerning reversion of any improvements constructed by the lessee to the lessor upon termination of the lease:

5. LESSEE'S COVENANTS: The LESSEE covenants and agrees that during the term of this Lease and for such further time as the LESSEE, or any person claiming under it, shall hold the demised premises or any part thereof;
* * * * * *
(G) Upon termination of this Lease, either by lapse of time or otherwise, to surrender, yield and deliver up the demised premises in such condition as it shall then be, subject to the provisions of paragraph 8 hereof....
* * * * * *
8. RIGHT TO MAKE ALTERATIONS, TITLE TO AND REMOVAL OF IMPROVEMENTS:
... Upon termination of the Lease, for any reasons whatsoever, LESSEE shall return to LESSOR, without cost to LESSOR, the leased ground with such improvements or structures that may have been erected thereon during the term of this Lease, by LESSEE and to convey and vest in LESSOR, title to such buildings, improvements or structures, free and clear of any liens, rights, title, interest, claim or demand whatsoever and to deliver to LESSOR such instrument of title or Deed which LESSOR may reasonably require conveying to LESSOR and vesting in LESSOR, title to such improvements, buildings or structures.
[3] The lease, in pertinent part, contained the following provisions concerning mortgaging of the leasehold estate by the lessee:

10. MORTGAGING OF LEASEHOLD ESTATE: In the event that LESSEE shall mortgage its leasehold estate and the mortgagee or holders of the indebtedness secured by the leasehold mortgage shall notify the LESSOR in the manner hereinafter provided for the giving of notice of the execution of such mortgage and name and place for service of notice upon such mortgagee or holder of indebtedness, or holders of indebtedness from time to time.
* * * * * *
(B) Such mortgagee or holder of indebtedness shall have the privilege of performing any of LESSEE's covenants hereunder or of curing any default by LESSEE hereunder or of exercising any election, option or privilege conferred upon LESSEE by the terms of this Lease.
* * * * * *
(E) No liability for the payment of the rental or the performance of any of LESSEE's covenants and agreements hereunder shall attach to or be imposed upon any mortgagee or holder of any indebtedness secured by any mortgagee upon the leasehold estate, all such liability being hereby expressly waived by LESSOR.
[4] The lease, in pertinent part, contained the following provision concerning successors and assigns of the lease:

26. BINDING ON SUCCESSORS OR ASSIGNS: The terms, conditions and covenants of this Lease shall be binding upon and shall inure to the benefit of each of the parties hereto, their heirs, personal representatives, successors, or assigns, and shall run with the land....
[5] The lease was also amended on March 1, 1983 to correct a typographical error in the January 10, 1983 amendment to lease.
[6] The amendment to the lease, in pertinent part, added the following provisions concerning the lender's right to exercise the rights of the lessee under the lease and limits upon the liability of the lender under the lease:

5. LESSOR and LESSEE agree that the LENDER shall be permitted, at its option, to "stand in the shoes" of the LESSEE and to exercise, on behalf of the LESSEE or itself, all options and rights, and to fulfill all duties and requirements, and to pay any obligations, charges or expense encumbered upon LESSEE to pay. However, the exercising of these rights and meeting these obligations shall not be mandatory on the part of LENDER but shall be optional.
* * * * * *
15. Article 19 is amended as follows:
* * * * * *
The parties agree, however, that any leasehold mortgage to LENDER shall require the LESSEE pledge and mortgage all rights and title it may have to the premises and to its leasehold interest and allow said LENDER to exercise all of LESSEE's rights, to stand in LESSEE's place, and to take over from LESSEE in the event of either a default on said indebtedness or if in the opinion of LESSEE it must act to protect its interests in the leasehold. Nothing contained in this article or in any other part of the lease shall operate to prevent the LENDER from so exercising its right to protect its security interests in the premises.
* * * * * *
19. The parties hereby agree to all of the above as witnesses (sic) by their signatures below and acknowledge that Gulf Federal Savings and Loan Association of Jefferson Parish, the LENDER herein appears only to enforce its rights and said LENDER shall have no obligation under this lease except as set out and limited above.
[7] The amendment to the lease, in pertinent part, added the following provision concerning continuation of the lender's mortgage:

8. Article 8 is hereby amended to include the following sentence: "Except that the said improvements shall remain subject to the LENDER's mortgage until said mortgage is fully paid."
[8] In refinancing the loan with the Bank of the South, Occhipinti had borrowed $1,200,000.00. The loan was secured by a collateral mortgage on Occhipinti's leasehold estate on the Carriere's land, and included all of the buildings and improvements located thereon.
[9] La. C.C. art. 3286, in pertinent part, provides:

The only things susceptible of mortgage are:
* * * * * *
(4) The lessee's rights in a lease of an immovable with his rights in the buildings and other constructions on the immovable.
This provision, derived from former La. R.S. 9:5102, was added to La. C.C. art. 3286 in 1991. See Acts 1991, No. 652, § 4. Former La. R.S. 9:5102, repealed by the same Act, stated:
The lessee, sub-lessee, or assignee of a lease or sub-lease of real property may mortgage, affect, and hypothecate his interest therein, together with his interest in any buildings, constructions, and improvements upon the leased premises then or thereafter existing. Nothing in this Section shall be construed to affect, diminish, or destroy the privilege of the lessor for the payment of rent and the enforcement of other stipulations of the lease. The mortgage shall not affect third persons unless and until recorded in the manner provided by law for the recordation of conventional mortgages upon real property.
[10] As this Court described it in Walker v. Dohan, 39 La. Ann. 743, 2 So. 381, 382 (1887), over 100 years ago:

A lease is defined by the Code as "a synallagmatic contract, to which consent alone is sufficient, and by which one party gives to another the enjoyment of a thing at a fixed price." The contract embodies, in itself, reciprocal rights and obligations,the right of enjoyment, and the obligation of paying the rent,which, so far as governed by the contract alone, co-exist and adhere to each other. Hence it has been repeatedly decided that the sale of the unexpired term of a lease, without qualification, is a sale of the lease for such term, as an entirety, including its obligations as well as its rights; or, in the language of the court, that the "bid for the lease, in such a case, is a premium which the bidder is willing to give for the transfer of the lease to himself, with all its obligations, as well as all the rights thereto attached, from the moment of the adjudication." Bartels v. Creditors, 11 La. Ann. 433; D'Aquin v. Armant, 14 La.Ann. 217; Brinton v. Datas, 17 La. Ann. 174; Lehman v. Dreyfus, 37 La. Ann. 587.
[11] In Walker v. Dohan, 39 La. Ann. 743, 2 So. 381, 383 (1887), this court quoted the following with favor:

What forbids the severance of a right from its correlative obligation, and the transfer of the one without the other? The lessee's right is to occupy the premises; his obligation, to pay the rent. Can he not make a sale or donation of the right, retaining himself the obligation to pay the rent? It is true that the non-fulfillment might defeat the enjoyment of his vendee of the right transferred. But the transfer and severance could be none the less possible and legal. * * * The lessor's rights are not thereby affected. 1 Hen. Dig. 803.
[12] La. C.C. art. 493, in pertinent part, states:

Buildings, other constructions permanently attached to the ground, and plantings made on the land of another with his consent belong to him who made them. They belong to the owner of the ground when they are made without his consent.
When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to their former owner.
[13] Though we address herein BOL's assertion that the court of appeal's decision in the prior suit between these parties did not result in a final judgment regarding the continued validity of the lease, we note that BOL makes this argument in the alternative. BOL first asserts that the lease was canceled prior to its foreclosure because: (1) the Carrieres sent Occhipinti letters of default and termination which, under the terms of the lease, resulted in a termination of the lease; and (2) the bankruptcy trustee rejected the lease as an asset of the bankruptcy estate. However, BOL's position that the lease was canceled by either of these events is belied by the fact that under the lease, if such a termination had occurred prior to foreclosure, ownership of the building would have vested in the Carrieres. If such were the case, BOL's subsequent foreclosure against only Occhipinti could not have resulted in ownership of the building by BOL.
[14] La. C.C. art. 2298 provides, in pertinent part:

A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared there is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
[1] Amended Paragraph 8 provides:

RIGHT TO MAKE ALTERATIONS, TITLE TO AND REMOVAL OF IMPROVEMENTS: LESSEE may make or permit any Sublessee to make alterations, additions and improvements to the demised premises from time to time and all of such alterations, additions and improvements including those which may be constructed by LESSEE in accordance with Paragraph 2 hereof, shall be and remain the property of the LESSEE or Sublessee, as the case may be, at all times during the term of this Lease and any extensions or renewals thereof. Upon termination of the Lease, for any reasons whatsoever, LESSEE shall return to LESSOR, the leased ground with such improvements or structures that may have been erected thereon during the term of this Lease, by LESSEE and to convey and vest in LESSOR, title to such buildings, improvements or structures, free and clear of any liens, rights, title, interest, claim or demand whatsoever and to deliver to LESSOR such instrument of title or Deed which LESSOR may reasonably require conveying to LESSOR and vesting in LESSOR, title to such improvements, buildings or structures. Except that the said improvements shall remain subject to the LENDER's mortgage until said mortgage is fully paid. (emphasis added).
[2] The real significance of the subordination agreement comes into play at the point when the lease terminates. At termination, the issue of ownership of the improvements arises. On this issue, the governing lease provision, La. Civ.Code art. 2726, cross-references the relatively new property articles, La. Civ.Code arts. 493, 493.1, 493.2 and 495, as the governing law. Under La. Civ.Code art. 493, "[i]f ground is leased and the lessee constructs a building upon it with the lessor's consent, the building belongs to the lessee, not the lessor." Vernon V. Palmer, Leases: The Law in Louisiana § 4-14 (1982). The parties, however, are free to alter the Codal provisions on ownership by contract.
[3] Significantly, the Bank made this amendment to the lease a condition of its mortgage loan to Occhipinti.