764 So.2d 1089 (2000)
K & M ENTERPRISES OF SLAUGHTER, INC.
v.
C.B. PENNINGTON.
No. 99 CA 0930.
Court of Appeal of Louisiana, First Circuit.
May 12, 2000.
Writ Denied June 30, 2000.
*1090 Ronnie J. Berthelot, Baton Rouge, Counsel for Plaintiff/Appellee, K & M Enterprises of Slaughter, Inc.
Bradley C. Myers, Lana D. Davis, Baton Rouge, Counsel for Defendant/Appellant, Claude B. Pennington, III.
Before: LeBLANC, PETTIGREW and KLINE[1], JJ.
LeBLANC, J.
On March 21, 1995, plaintiff, K & M Enterprises of Slaughter, Inc. (K & M), through its president, Michael Naquin (hereinafter referred to interchangeably, as appropriate), entered into a lease agreement with Daryl Pennington (Daryl), on behalf of the defendant, C.B. Pennington, Sr. (Pennington),[2] for the purpose of farming *1091 corn on a portion of Mount Pleasant Plantation, defendant's property. Upon signing the lease, Naquin immediately prepared the soil and planted approximately 406.2[3] acres of corn. The plants began to grow; however, the entire crop was eventually devastated by "hundreds" of deer that came onto the property and ate the corn. This litigation ensued. After a trial, the trial court found in favor of K & M and against Pennington and awarded K & M a total of $178,180.00, for the loss of its crop, together with legal interest. The trial court also dismissed a reconventional demand filed by Pennington seeking to recover from the plaintiff all expenses incurred in returning the property to the condition it was in prior to the lease with Naquin. This appeal by Pennington follows.
Pennington makes the following assignments of error, in each of which we find merit:
I. The Trial Court Erred in Ruling That Pennington was Responsible for the Loss of Plaintiff's Crop from Deer Damage Because Plaintiff Contractually Assumed All Risks Related to its Farming Operations.
II. The Trial Court Erred in Failing to Find that Plaintiff's Loss was Caused by an Act of God for Which Pennington Was Not Responsible.
III. The Trial Court Erred in Finding That Pennington had a Legal Duty to Allow Plaintiff to Install Electrical Fences on the Leased Property.
A. Pennington Did Not Have a Duty to Allow Plaintiff to Install Electrical Fencing on the Leased Property.
B. If Pennington Had a Duty to Allow Fencing, He Did Not Breach It.
C. If Pennington Breached the Duty to Plaintiff, the Breach Did Not Cause the Total Crop Loss.

Contractual Assumption of Risk
The lease contract is the law between the parties in defining their respective legal rights and obligations. Carriere v. Bank of Louisiana, 95-3058, p. 8 (La.12/13/96), 702 So.2d 648, 666. We are obligated to give legal effect to contracts according to the true intent of the parties. La. C.C. art. 2045; Alco Collections, Inc. v. Poirier, 95-2582, p. 6 (La.App. 1 Cir. 9/27/96), 680 So.2d 735, 740, writ denied, 96-2628 (La.12/13/96), 692 So.2d 1067. Further, each provision in an agreement must be interpreted in light of the other provisions so that each is given the meaning suggested by the agreement as a whole. La. C.C. art. 2050. The lease between the parties contained the following terms and conditions:
Approximately 2,000 acres, known as Mt. Pleasant Plantation, is all located in East Baton Rouge Parish, Louisiana.
This agreement is effective on the date of execution and ends on January 31, 1996; the acreage to be planted is 300± acres. Rental rate shall be cash rent $20.00 per acre planted and is payable when the lease is executed.
Acreage not planted shall be maintained by you in appearance by clipping at least twice during the lease period.
This lease agreement may only be assigned in whole or in part by express written consent.
No hunting of any kind permitted on property.

*1092 All risks, responsibilities, and obligations related to farming operations will be assumed by farmer. (emphasis added.)
Mr. Naquin readily admits that by signing the lease he contractually assumed all risks relating to the farming operations, including soil and weather conditions, weed problems, and the possibility of insect infestation. However, he claims that the risk of deer eating all of his corn crop was not one of the risks assumed under the lease. Nevertheless, when questioned about the risk of wildlife eating his crops, Naquin testified, "[m]y responsibility, sir, is when they [wildlife] start to damage my crop that I do something to prevent them from doing it. That's my responsibility."
The record reveals that Mr. Naquin has been farming in East Baton Rouge and East Feliciana Parishes since 1951, having both owned and leased property during that time. The record also reveals that Mount Pleasant Plantation is bordered on the western side by the Mississippi River and contains wooded areas as well as open fields. Mr. Naquin testified that he was familiar with the characteristics of the land and knew there were always deer in the East Baton Rouge and East Feliciana Parish areas. He admitted he had actually seen a few deer on the Pennington property prior to planting the corn. He even acknowledged that in the past, he had experienced deer "nibbling around the edge" of his crops, and that he accepted this small amount of damage as a normal risk of his farming operations.
Despite the clear language in the lease agreement regarding Naquin's assumption of all risks relating to his farming operations, Naquin maintains that the lease language is ambiguous and that a further search for the intent of the parties reveals that he did not assume the risk of wildlife devastating his crop. We do not find that the lease language is ambiguous or that it contains technical terms or words of art. Furthermore, even if we accept that the language is susceptible of more than one meaning, the record clearly established that in the world of farming, particularly in the wooded area near the Mississippi River as is the land at issue in this matter, the risk of deer damaging a corn crop is an anticipated risk related to farming operations. Given the experience gained by Mr. Naquin in his many years of farming, including a familiarity with the natural habitat of the land and the behavior of wildlife in the area, and his own observations of the presence of deer on the property, together with the clear language of the lease agreement, it is very clear that the risk that deer, or other wildlife, would cause damage to his crop was contractually assumed by Naquin as a risk related to his farming operations on the Mount Pleasant property. The unfortunate consequence that the risk resulted in more damage than anticipated is still within the scope of "all" risks assumed, and the trial court clearly erred in finding otherwise.

Acts of God
Pennington also argues that trial court erred in failing to find that plaintiff's loss was caused by an act of God for which Pennington was not responsible. An act of God is an unusual, extraordinary, sudden and unexpected manifestation of the forces of nature which cannot be prevented by human care, skill or foresight. Rector v. Hartford Accident Indemnity Company of Hartford, Conn., 120 So.2d 511, 514 (La. App. 1 Cir.1960). It is undisputed that the number of deer on the Pennington property in 1995 was extraordinarily high, and the damage caused thereby to Naquin's crop was more severe than anticipated. Naquin argues that Pennington somehow knew there was an extraordinary number of deer on the property that would potentially devastate his entire crop and failed to reveal this to him. However, the record establishes there were two environmental forces that caused this higher concentration of deer on the property than under normal conditions. Robert Love, a wildlife biologist with the Department of Wildlife and Fisheries, testified that the first of *1093 these was the unusually high elevation of the Mississippi River, which had the effect of driving the deer away from the batture areas and onto higher ground, i.e., the Pennington property. The second force of nature was a red oak "mast" failure (acorn crop failure) in the fall of 1994. This loss of a natural food source for the deer caused them to search for alternative food sources, like Naquin's corn crop.
These environmental forces that caused the unusually high number of deer on the Pennington property are clearly acts of God for which Pennington is not legally responsible. Neither could have been foreseen; and even if foreseen, neither could have been prevented. Therefore, as a matter of law, the trial court erred in finding the lessor liable for damage caused by these acts of God. Further, these acts of God are among the "risks" assumed contractually by Naquin in the lease.

Electrical Fence
Naquin claims that he offered to put up an electrical fence at his own cost, and that Pennington's refusal to allow him to do so caused him the loss of his crop. Pennington maintains that he had no legal duty to allow Naquin to erect a fence. Even if such a duty existed, Pennington further maintains that such duty was not breached. And, even if the duty was breached, Pennington maintains this breach did not cause the total loss of Naquin's crop.
The facts related to the electrical fence issue are disputed; however, the record establishes the following. After noticing the initial damage to his crop by deer nibbling at the edges, Naquin called a meeting with Pennington to see what could be done to prevent further damage. A meeting was held between Naquin, Daryl Pennington and Robert Love of the Department of Wildlife and Fisheries. At this meeting, Naquin offered to put up an electric fence at his own cost.[4] Daryl responded that he would have to check with his grandfather (defendant), but he cautioned that his grandfather had never allowed his property to be fenced in the past and he (Daryl) did not think Pennington would allow it now.
Although it is disputed at whose cost the fence would have been erected, it is undisputed that the whole fence issue was "left at the table" at the end of the meeting, with Daryl stating he would check with his grandfather. However, neither party followed up on the issue.
Initially, we note that the erection of fences was not negotiated in the lease agreement itself. Nevertheless, Naquin maintains that Pennington was legally obligated to maintain the leased property in a condition to serve the use for which it was intended and to provide the lessee with the peaceable possession of the land. According to Naquin, this obligation includes the duty to allow him to erect an electric fence to protect his crops from the deer invasion.
Whether providing Naquin with "peaceable possession" of the land includes allowing Naquin to erect an electric fence is the more difficult question, which we need not decide, because we find that even if such a duty was owed, Naquin has failed to show that it was breached, or that the loss to his crop was caused by the alleged breach.
As noted earlier, Naquin admitted that once he became aware of the deer eating his crop, it was his own responsibility to prevent further damage. Naquin has failed to prove that his inability to prevent further damage was somehow caused by Pennington. He has failed to prove that his request to erect a fence was categorically refused. It is undisputed that the request was unresolved at the end of the meeting, and no one ever followed up on it. Naquin testified that Daryl never got back *1094 to him after he talked with his grandfather about it; Daryl testified that he never heard anything further about the fence from Naquin. This is not a situation where Naquin was prepared with materials and labor to erect the fence, but was prevented from doing so by Daryl's refusal. Daryl simply indicated that he needed his grandfather's permission to allow such a fence and he indicated that the permission may not be forthcoming because it had not been granted in the past.
Therefore, while Pennington may have had a duty to allow Naquin to prevent any further damage, we find Naquin has failed to prove that such a duty was breached. And even if breached, there is sufficient evidence in the record to establish that the damage to Naquin's crop was already severe and that the erection of a fence at this stage would do little to deter the deer that were already feeding on the crop.
Thus, without deciding whether the lease agreement obligated Pennington to allow his lessee to alter the land in order to protect his crop, we find the trial court erred in holding that such a duty was breached and that this breach caused the total loss of Naquin's crop.
For all of the foregoing reasons, we find merit to Pennington's appeal, and reverse the judgment of the trial court.
We now address the issue of whether the trial court erred in dismissing Pennington's reconventional demand for the expenses incurred in returning the property to its former condition after the lease expired. In particular, Pennington complains that Naquin dug ditches in the land across roads used to traverse the property and left the rows of dirt and large piles of lime on the property. Naquin denies that he damaged the land or the roads thereon in any way and maintains that ditches were dug for proper drainage and the rows built as part of the soil preparation which was authorized by Daryl Pennington and comprised an integral part of the farming operations which were the object of the lease. Thus, Naquin maintains he was under no obligation to return the land to its former condition.
Our review of the record reveals that the land was only altered by Naquin in furtherance of the farming operations that were the clear object of the lease, and that such alterations, being integral parts of farming operations, were anticipated by the parties as part of the purpose for which the lease was intended. Therefore, Pennington has failed to prove that he is entitled to recover damages on the reconventional demand. The trial court did not err in dismissing this claim.
For all the foregoing reasons, the judgment of the trial court in favor of plaintiff and against Pennington is reversed; the denial of the reconventional demand is affirmed. All costs of this appeal are assessed to plaintiff.
REVERSED.
NOTES
[1] Retired Judge William F. Kline, Jr. serving by special appointment of the Louisiana Supreme Court.
[2] The defendant, C.B. Pennington, Sr. died during the pendency of these proceedings; his grandson, Claude B. Pennington, III, was substituted in his capacity as executor of the Succession of Claude B. Pennington, Sr., as proper party defendant and plaintiff-in-reconvention.
[3] Although the lease agreement provides "the acreage to be planted is 300± acres," Naquin testified that pursuant to a verbal agreement he had with Pennington, he was allowed to plant as much of the land as he physically could.
[4] Pennington disputes that the offer from Naquin was to erect the fence at his own cost. Even Naquin admits that he also mentioned that perhaps Pennington could pay for the fence and use the expense as a tax write-off. However, Naquin insists this was an offhand suggestion and that he stood by, ready and willing to pay for the cost of the fence.