943 So.2d 1104 (2006)
Desiree BENNETT
v.
TRINITY UNIVERSAL INSURANCE COMPANY, Turner United Partnership and United Companies Realty and Development Company, Inc.
No. 2005 CA 1957.
Court of Appeal of Louisiana, First Circuit.
September 15, 2006.
*1105 Frank R. Whitely, Baton Rouge, Counsel for Appellees, Intervenor and Defendant in Reconvention, St. Paul Fire and Marine Insurance and Third-Party Defendant, Arkansas Blue Cross-Blue Shield.
Amos H. Davis, Baton Rouge, Counsel for Defendants/Appellants, Turner United Partnership, United Companies Realty and Development Companies, Inc., et al.
Before: CARTER, C.J., WHIPPLE and McDONALD, JJ.
WHIPPLE, J.
Turner United Partnership, United Companies Realty and Development Companies, Inc., and Trinity Universal Insurance Company, appeal from a judgment of the trial court dismissing their reconventional and third-party demands and ordering that Trinity Universal Insurance Company reimburse St. Paul Fire and Marine Insurance Company the amount of its lien for workers' compensation benefits and medical benefits paid to plaintiff. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
On September 11, 1997, plaintiff, Desiree Bennett, an employee of Arkansas Blue Cross-Blue Shield ("Blue Cross-Blue Shield"), was injured when she tripped in a hole while walking to the outdoor, designated smoking area for United Plaza Building Number Nine, where her employer, Blue Cross-Blue Shield, was a tenant and maintained an office. At the time of the accident, appellants, Turner United Partnership and United Companies Realty and Development Company, Inc., owned the property, commonly known as "United Plaza Building Number Nine" and, pursuant to a written lease entered into between the parties, leased office space to Blue Cross-Blue Shield.[1]
On August 18, 1998, plaintiff filed a petition for damages, naming as defendants Turner United Partnership ("Turner"), United Companies Realty and Development Company, Inc. ("United"), and their liability insurer, Trinity Universal Insurance Company ("Trinity"), (or collectively, "defendants"). On October 2, 1998, United, Turner, and Trinity filed an answer, generally denying any liability for plaintiff's injuries. On November 3, 1998, St. Paul Fire and Marine Insurance Company ("St.Paul"), in its capacity as Blue Cross-Blue Shield's workers' compensation insurance carrier, filed a petition of intervention, asserting its statutory right to be paid by preference out of any judgment or sums paid to plaintiff and seeking reimbursement from the defendants for workers' compensation benefits and medical payments made by St. Paul to plaintiff as a result of this accident.
On August 1, 2001, defendants filed a reconventional demand against St. Paul and a third-party demand against Blue Cross-Blue Shield. Defendants claimed that by failing to obtain a subrogation waiver from St. Paul, Blue Cross-Blue Shield had violated Section 8.18 of the Lease Agreement whereby Blue Cross-Blue Shield purportedly agreed to waive subrogation against United, Turner, and Trinity and to "cause [Blue Cross-Blue Shield's] insurance carriers to waive *1106 same."[2] United, Turner, and Trinity further claimed that, pursuant to the indemnity provision set forth in Section 5.04 of the Lease Agreement, Blue Cross-Blue Shield had agreed to defend, hold harmless, indemnify and/or reimburse United, Turner, and Trinity for any losses resulting from Blue Cross-Blue Shield's failure to perform and discharge its covenants and obligations under the Lease Agreement, including the claims asserted by plaintiff.[3] Thus, defendants contended, Blue Cross-Blue Shield was responsible for the losses incurred by defendants due to Blue Cross-Blue Shield's alleged "active breach" of its contractual obligations to defendants under the lease.
Plaintiff ultimately settled her tort claims in the main demand against the defendants. As a result of that settlement, on November 27, 2001, plaintiff filed a motion and order for partial dismissal, dismissing her claims against defendants with prejudice, but reserving all rights of plaintiff and Trinity against Blue Cross-Blue Shield and St. Paul. Thus, the trial involved only these remaining claims, i.e., defendants' reconventional and third-party claims against Blue Cross-Blue Shield and intervenor, St. Paul. At trial, defendants introduced a copy of the Receipt and Release Agreement executed on August 10, 2001, evidencing the terms of the settlement between plaintiff and defendants.[4]
*1107 On May 4, 2005, the trial court issued written reasons for judgment, dismissing the defendants' reconventional and third-party demands and granting St. Paul's petition for intervention. The trial court further ordered that United and Trinity reimburse St. Paul the full amount claimed as its lien, $74,515.30, for workers' compensation payments made to plaintiff, with interest from the date of demand, and all costs of court. In its written reasons, the trial court stated that it adopted and incorporated as its reasons "the post-trial brief" submitted by St. Paul and Blue Cross-Blue Shield.[5] A written judgment in conformity with the court's ruling was signed on May 27, 2005. The instant appeal by defendants followed.
On appeal, defendants assign the following as error:
1. [The trial court] erred in considering any parole [sic] evidence or argument regarding the drafting and negotiating of the lease or the parties' intent where the provisions in question were clear and explicit and did not lead to any absurd circumstances; and
2. [The trial court] erred in failing to uphold the clear and explicit language of Section 8.18 of the lease between Turner United and Blue Cross which required Blue Cross to waive any subrogation rights and cause its insurers to do the same; and
3. [The trial court] erred in failing to uphold the clear and explicit language of Section 5.04 of the lease which obligated Blue Cross to fully defend and indemnify Turner United for any losses resulting from Blue Cross's breach of its obligation under the lease to obtain subrogation waivers from its insurers.

DISCUSSION
The lease contract is the law between the parties in defining their respective legal rights and obligations. Carriere v. Bank of Louisiana, 95-3058, p. 8 (La.12/13/96), 702 So.2d 648, 666. Each provision in an agreement must be interpreted in light of the other provisions so that each is given the meaning suggested by the agreement as a whole. LSA-C.C. art. 2050; K & M Enterprises of Slaughter, Inc. v. Pennington, 99-0930, p. 3 (La. App. 1st Cir.5/12/00), 764 So.2d 1089, 1091, writ denied, XXXX-XXXX (6/30/00), 766 So.2d 548.
We are obligated to give legal effect to contracts according to the true intent of the parties. LSA-C.C. art. 2045. The true intent of the parties to a contract is to be determined by the words of the contract when they are clear, explicit, and lead to no absurd consequences. LSA-C.C. art. 2046; Fleniken v. Entergy Corporation, 99-3023, 99-3024, p. 14 (La.App. 1st Cir.2/16/01), 790 So.2d 64, 73, writs denied, XXXX-XXXX, XXXX-XXXX (La.6/15/01), 793 So.2d 1250, 1252. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. 2046; Amoco Production Company v. Fina Oil & Chemical Company, 95-1185, p. 11 (La.App. 1st Cir.2/23/96), 670 So.2d 502, 511, writ denied, 96-1024 (La.5/31/96), 673 So.2d 1037.
*1108 In such cases, the meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. LSA-C.C. art. 1848; Amoco, 95-1185 at 12, 670 So.2d at 511. Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law. Fleniken, 99-3023, 99-3024 at 14, 790 So.2d at 73. The use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. Fleniken, 99-3023, 99-3024 at 14, 790 So.2d at 73.
Defendants aver on appeal that they are entitled to indemnification under the terms of the lease and that they are entitled to damages, representing their "losses" incurred as a result of Blue Cross-Blue Shield's "negligence in failing to obtain a waiver from St. Paul" and breach of the contract of lease. We find no merit to these claims.
In rendering its judgment, the trial court apparently found that the pertinent portion of Section 5.04 of the Lease Agreement, which would seemingly have obligated Blue Cross-Blue Shield to be liable for any injuries caused by any defects in United's premises, was not made part of the lease. Specifically, as Blue Cross-Blue Shield contended, and the trial court apparently agreed, because this portion of the Lease Agreement was stricken through, Blue Cross-Blue Shield had no contractual or other obligation upon which liability could be imposed for plaintiff's injuries caused by defects in the property. Therefore, any obligation to waive subrogation and "cause Tenant's insurance carriers to waive same" under "any insurance policy" as contemplated by Section 8.18, did not apply to plaintiff's liability claims related to or based upon defects in the defendants' premises.
Moreover, as the trial court apparently recognized, because defendants' settlement with plaintiff was entered into without the written consent of St. Paul, in direct violation of LSA-R.S. 23:1102 C(1), defendants were statutorily required to reimburse St. Paul for the total amount of workers' compensation and medical benefits paid to satisfy the intervenor's statutory privilege.
Defendants argue at length that there was no legal impediment or prohibition to the parties contractually agreeing that Blue Cross-Blue Shield, as lessee, would assume responsibility for the defendants' premises, agree to indemnify defendants, agree to obtain liability insurance on the premises, and agree to obtain subrogation waivers from such insurers, vis-à-vis any and all claims for injuries, whether resulting from the defendants' negligence or any defects in the premises. However, even assuming arguendo that no impediment existed to prevent the parties from so contracting, a plain reading of the lease, in its entirety, and giving meaning to all of its provisions, reflects that the parties did not do so. Pretermitting the issue of whether or not the trial court erred in admitting parol evidence regarding the negotiations and intent of the parties in confecting the lease, the lease agreement shows that the trial court's ruling was correct.
As noted above, Section 5.04 of the Lease Agreement obligated Blue Cross-Blue Shield to indemnify defendants solely for claims based on the negligence or fault of Blue Cross-Blue Shield, resulting from any omission, negligence or misconduct on the part of Blue Cross-Blue Shield, its agents, employees, etc. or for any claims arising from its use or "thing done or occurring" on the premises or resulting from any failure of Blue Cross-Blue Shield *1109 to perform its obligations under the lease. However, the remaining portion of Section 5.04, through which the lease would assign liability to a lessee for any claims arising from use of the premises, including those due to the defendants' own negligence or any condition, design or defect in the building, mechanical systems, "or elsewhere in the . . . Premises . . . or property adjacent thereto," was specifically rejected and stricken from the lease confected by the parties. Defendants cite no other provision in the lease upon which such liability was accepted by Blue Cross-Blue Shield or upon which defendants' theory of liability could be contractually imposed.
Instead, as noted by Blue Cross-Blue Shield, at best, Blue Cross-Blue Shield was only obligated to reimburse or indemnify for any damage or injury done to the building and premises caused by its agents, employees, etc.[6] and was only required to maintain public liability insurance coverage to ensure coverage for any such liability claim.[7]
As set forth in Louisiana Revised Statutes 23:1102 C(1):
When a suit has been filed against a third party defendant in which the employer or his insurer has intervened, if the third party defendant or his insurer fails to obtain written approval of the compromise from the employer or his insurer at the time of or prior to such compromise and the employee fails to pay to the employer or his insurer the total amount of compensation benefits and medical benefits out of the funds received as a result of the compromise, the third party defendant or his insurer shall be required to reimburse the employer or his insurer to the extent of the total amount of compensation benefits and medical benefits previously paid to or on behalf of the employee to the extent said amounts have not been previously paid to the employer or his insurer by the employee pursuant to the provisions of Subsection B of this Section. Notwithstanding such payment, all rights of the employer or his insurer *1110 to assert the defense provided herein against the employee's claim for future compensation or medical benefits shall be reserved.
If a third-party defendant or his insurer fails to obtain written approval of a settlement or compromise, a claim for reimbursement is properly pursued against the third-party defendant or his insurer under LSA-R.S. 23:1102 C(1). See Prevost v. Jobbers Oil Transport Company, 95-0224 (La.App. 1st Cir.10/6/95), 665 So.2d 400, 406, writ denied, 96-0440 (La.4/8/96), 671 So.2d 336. The evidence introduced at trial shows that defendants failed to obtain written approval for the compromise from the intervenor, St. Paul.[8] As such, we find no error in the trial court's determination that the defendants' breach of LSA-R.S. 23:1102 C(1) required them to reimburse St. Paul for its workers' compensation lien and dismissed defendants' third-party demands as meritless.

CONCLUSION
For the above and foregoing reasons, the May 27, 2005 judgment of the trial court is affirmed. Costs of this appeal are assessed against the defendants/appellants, United, Turner, and Trinity.
AFFIRMED.
NOTES
[1] The "Lease Agreement" was entered into by the parties in September of 1990 and contained an initial three-year term. The parties entered into subsequent agreements extending and renewing the lease for additional three-year terms in 1993, 1996, and 1998.
[2] Section 8.18 of the Lease Agreement provides as follows:

Waiver of Subrogation. Tenant waives any right of subrogation against Landlord and its officers, directors, employees and representatives under any insurance policy and shall cause Tenant's insurance carriers to waive same and so notify Landlord.
[3] Section 5.04 of the Lease Agreement provides as follows:

Indemnity; Liability. Tenant shall defend and fully indemnify and hold harmless Landlord and its officers, directors, employees, agents and representatives from any and all liability for injury, loss, accident or damage to any person(s) or property(ies), and from any claims, actions, proceedings and expenses and costs in connection therewith (including without limitation reasonable counsel fees), (i) arising in whole or in part from (a) the omission, fault, willful act, negligence or other misconduct of Tenant, its contractors, agents, employees, invitees, and visitors or (b) from any use made or thing done or occurring on the Leased Premises, or (ii) resulting in whole or in part from the failure of Tenant, its agents or employees, to perform and discharge its covenants and obligations under this Lease. Tenant is or will become familiar with the Leased Premises, acknowledges that the same are received by Tenant in a good state of repair, accepted by Tenant in the condition in which they are now or shall be when ready for occupancy, and that Landlord and its officers, partners, employees, agents and representatives shall not be liable to Tenant or Tenant's contractors, agents, employees, invitees or visitors for any damage to person(s) or property(ies) due to any condition, design, or defect in the Building or its mechanical systems or elsewhere in the Leased Premises or the Building or the property adjacent thereto which may now exist or hereafter occur. Landlord and its officers, directors, employees, agents, and representatives shall be defended and indemnified and held harmless and exonerated by Tenant from any liability caused by or arising in whole or in part from Landlord's negligence or that of its officers, directors, employees, agents, and representatives to the full extent permitted by law. Tenant accepts the Leased Premises as suitable for the purpose for which the same are leased and assumes all risks of damage to person(s) or property(ies), and agrees that no representatives except such as are contained herein have been made to Tenant respecting the condition of the Leased Premises.
[4] The parties stipulated that the incident involving plaintiff occurred while she was an employee of Blue Cross-Blue Shield, acting in the course and scope of her employment, and that she was on the leased premises when she was injured.
[5] We note that Blue Cross-Blue Shield and St. Paul filed a "Post Hearing Memorandum" and a "Supplemental Post Hearing Memorandum." Because it is not clear from the trial court's written reasons for judgment which post-trial memorandum it adopted, for purposes of our review, we assume that the court's reasoning was in accord with the statements set forth in both post-trial memoranda.
[6] Section 5.01 of the lease agreement provides:

Maintenance, Repairs and Re-entry. Tenant shall, at Tenant's sole cost and expense, repair or replace any damage or injury done to the Building, or any part thereof, or any property of Landlord adjacent thereto, caused by Tenant or Tenant's contractors, agents, employees, invitees or visitors. If Tenant fails to make such repairs or replacements promptly, or within fifteen (15) days after such occurrence, Landlord may at its option, make such repairs or replacements, and Tenant shall repay the cost thereof to Landlord on demand. Tenant shall keep the interior of the Leased Premises in good order and repair at its own expense; and agrees to surrender the Leased Premises at the expiration of this Lease or at such other time as it may vacate the Leased Premises in as good condition as when received, excepting depreciation caused by ordinary wear and tear. Tenant will not commit or allow any waste or damage to be committed on any portion of the Leased Premises.
[7] Section 5.05 of the lease agreement provides:

Public Liability Insurance. Tenant shall, at all times during the Leased Term and all extensions thereof, carry Owner's, Landlord's and Tenant's public liability insurance coverage on the Leased Premises with an insurance company authorized to do business in the State of Louisiana, with limits of not less than $300.00 per occurrence for injury or death and limits of not less than $100,000 for injuries to property, and with deductibles acceptable to Landlord. The insurance policy effecting such coverage shall name the Landlord as a named insured, and Tenant shall furnish to Landlord a copy of said insurance policy, or certificate of insurance, duly certified by the insurer, which policy shall contain a clause requiring insurer to give Landlord no less than ten (10) days prior notice of cancellation of the policy.
[8] Additionally, defendants acknowledge in their brief that regardless of whether Blue Cross-Blue Shield actually waived subrogation or is deemed to have contractually waived subrogation, absent a specific waiver by St. Paul, the carrier remains entitled to reimbursement for compensation benefits paid. LSA-R.S. 23:1101 and 23:1103; Sandbom v. BASF Wyandotte, Corporation, 95-0335 (La.App. 1st Cir.4/30/96), 674 So.2d 349, 362.