NETTIE BROWN INDIVIDUALLY AND ON BEHALF OF SHANTAI T. BROWN, JASMINE P. BROWN, AND TONIA M. BROWN
v.
BONNIE IRIS FLOYD AND JEFFERY FLOYD AND SHELTER INSURANCE COMPANY.
No. 2007 CA 0478
Court of Appeals of Louisiana, First Circuit.
January 30, 2008.
ALLEN J. MYLES, Counsel for Plaintiff/Appellee, Nettie Brown Individually and, on behalf of Shantai T. BROWN, JASMINE P. BROWN, and TONIA, M. BROWN
VALERIE BRIGGS BARGAS, Counsel for Defendant/Appellant, BONNIE IRIS FLOYD, JEFFERY FLOYD and Shelter Mutual Insurance Company.
Before: GAIDRY, McDONALD, and McCLENDON, JJ.
McCLENDON, J.
Defendants appeal the judgment of the trial court awarding the plaintiff $38,500 in property damage resulting from an apartment fire. For the reasons that follow, we reverse.

FACTS AND PROCEDURAL HISTORY
On July 24, 2001, Nettie Brown entered into a lease agreement for Apartment A with Bonnie Iris Floyd and Jeffery Floyd, the owners of a fourunit apartment building, on Stern Avenue in Baton Rouge, Louisiana. On August 24, 2002, a fire broke out in Ms. Brown's apartment while she and her three children were away from the apartment. The fire was confined to the kitchen, but the rest of the apartment sustained smoke damage. An investigation by the Baton Rouge Fire Department indicated that the origin of the fire was the stove control panel and the cause of the fire was an electrical malfunction in the timer.
Subsequently, on March 7, 2003, Ms. Brown, individually and on behalf of her minor children, Shantai T. Brown, Jasmine P. Brown and Tonia M. Brown, filed a petition for damages against the Floyds and Shelter Mutual Insurance Company, as the insurer of the complex.[1] Plaintiff alleged that the Floyds had been notified of problems with the stove prior to the fire and failed to replace it. In their answer, defendants generally denied the allegations of the petition and affirmatively alleged that plaintiff failed to notify them of any problems with the stove.
Following a bench trial on July 17 and 18, 2006, the matter was taken under advisement, and on December 7, 2006, the trial court rendered its judgment awarding Ms. Brown $35,000 for her loss of property and awarding Shantai Brown $3,500 for the loss of baby items.[2]
Defendants have suspensively appealed the trial court's judgment, asserting that the trial court erred in ruling in favor of the plaintiff and also in its assessment of damages.

STANDARD OF REVIEW
In order to reverse a trial court's determination of a fact, a reviewing court must review the record in its entirety and (1) find a reasonable factual basis does not exist for the finding, and (2) further determine the record establishes that the fact finder is clearly wrong or manifestly erroneous. To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. Nevertheless, the issue to be resolved by the reviewing court is not whether the fact finder was right or wrong, but whether the fact finder's conclusion was a reasonable one. Hanks v. Entergy Corp., 06-477, pp. 22-23 (La. 12/18/06), 944 So.2d 564, 580.
If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Hanks, 06-477 at p. 23, 944 So.2d at 580.
However, where documents and objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, the reviewing court may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Id.

DISCUSSION
Among their arguments on appeal, defendants assert that they are not responsible for plaintiffs damages because of the liability-shifting provision in the lease signed by Ms. Brown. They assert that Ms. Brown failed to prove that she discussed with the defendants any problems with the stove. Defendants contend that Ms. Brown's testimony was "contradicted continuously" whereas the testimony of defendants' witnesses was consistent in that they never received notice of a problem with the stove.
The lease contract is the law between the parties in defining their respective legal rights and obligations. Bennett v. Trinity Universal Ins. Co., 05-1957, p. 6 (La.App. 1 Cir. 9/15/06), 943 So.2d 1104, 1107. Pursuant to LSA-R.S. 9:3221, a building owner is permitted to pass on responsibility for the conditions of his property and the lessee is allowed to assume responsibility. Pellegrin v. Ditto, 625 So.2d 1356, 1362 (La.App. 1 Cir. 1993). At the pertinent time herein, LSA-R.S. 9:3221[3] provided:
The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time.
Thus, to establish liability on the part of a lessor who has passed on responsibility for the condition of his property to his lessee under LSA-R.S. 9:3221, a plaintiff must establish that he sustained damages; that there was a defect in the property; that the lessor knew or should have known of the defect; and that the lessor thereafter failed to remedy the defect within a reasonable time. Pellegrin, 625 So.2d at 1362-63; Smith v. French Market Corp., 03-1412, p. 5 (La.App. 4 Cir. 10/6/04), 886 So.2d 527, 530, writ denied, 04-2741 (La. 1/14/05), 889 So.2d 272.
The written lease executed by Ms. Brown and Ms. Floyd contained the following provision, in part, under the section entitled "Liability":
Lessee has inspected the premises and assumes responsibility for their condition. Lessor shall not be liable for injury caused by any defect in or on the premises or in or on Lessor's property to the Lessee or anyone on the premises or Lessor's property who derives his right to be thereon from the Lessee, unless the Lessor knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time. Should Lessee fail to promptly so notify Lessor, in writing, of any such defects, Lessee will become responsible for any damage resulting to Lessor or other parties.
Therefore, because Ms. Brown assumed responsibility for the condition of the leased premises pursuant to LSA-R.S. 9:3221, defendants are not liable for plaintiff's damages unless they knew or should have known of the defect and failed to remedy it within a reasonable time.
At trial, Robert W. Warren, a fire investigator with the Baton Rouge Fire Department, who was qualified as an expert in the field of fire investigation by stipulation, testified that the origin of the fire was on top of the stove near the timer of the control panel. He stated that some wires had arced and appeared to have shorted out. Mr. Warren also testified that Ms. Brown told him at the scene of the fire that she had not had any prior problems with the stove.
However, Ms. Brown testified that the stove never worked well, that it would burn food, and that it would short out. Ms. Brown stated that when she first looked at the apartment, she told Ms. Floyd that the stove did not look new and Ms. Floyd stated to her that all it needed was cleaning. Ms. Brown testified that she told Ms. Floyd of the problems with the stove, and Ms. Floyd told her to make a list, which she did. Ms. Brown testified that she gave two lists to Ms. Floyd, one dated August 12, 2001, regarding general complaints about the apartment, and a second list dated August 21, 2001, specifically regarding problems with the appliances. Ms. Brown stated that the maintenance man for the apartment complex did change the gauge for the oven. On cross-examination, Ms. Brown testified that she also told Ms. Chatman, the apartment manager, about problems with the stove. Ms. Brown further stated that on the day of the fire, she and her daughters went to a friend's house, which was a few duplexes away.
When Ms. Floyd was called under cross-examination, she denied ever receiving complaints from Ms. Brown about the stove and further denied receiving a punch list from Ms. Brown. Counsel for the defendants objected to the introduction of the punch list (the two-page document, dated August 12, 2001 and August 21, 2001), stating that this was the first time she learned of its existence. Nevertheless, the trial court allowed the punch list to be introduced into evidence.[4]
Ms. Floyd testified that the stove in plaintiffs apartment was new. She stated that Apartment A was the first apartment in the building to be renovated and was the first one rented. A receipt dated May 26, 2001, from Lowe's Home Improvement Warehouse was introduced into evidence showing appliances, including a new electric Frigidaire range, and other items purchased by the Floyds on their business account.[5] Ms. Floyd also testified that when Ms. Brown moved into the apartment, she was the one who took the complaints about the apartments, and Ms. Brown made no complaints about any of the appliances in the apartment. Thereafter, Melba Chatman was hired as an on-site property manager in March of 2002. Ms. Chatman took complaints during the day, but Ms. Floyd still received complaints after business hours. Ms. Floyd then explained the procedure for processing complaints. She stated that the person receiving the complaint would complete a work-order form identifying the problem and the apartment and give it to the maintenance man. Ms. Floyd determined which complaints were emergencies, which were to be handled right away. Ms. Floyd testified that no complaints were made regarding the stove.
Ms. Chatman also testified that she received no complaints from Ms. Brown regarding the stove. The last two work orders for Ms. Brown's apartment were regarding the kitchen sink and the bathroom sink. Ms. Chatman testified that when a complaint about an apartment was made, she would write up a work order, give it to the maintenance technician to be repaired, and once the repair was made, the work order was returned to her to file away. Ms. Chatman stated that she saw Ms. Brown at the scene of the fire and asked her what happened. Ms. Brown responded that she did not know. Further, after the fire, Ms. Chatman went through files at the office and at Ms. Floyd's house to look for work orders for Ms. Brown's apartment and found no work orders regarding the stove.
Mr. Isizah Chatman testified that he worked for Ms. Floyd as a maintenance technician at the apartment building from March or May 2001 to 2005. He testified that he got a call on one occasion for Apartment A, regarding a leak under the kitchen sink and a closet door that would not close. Those were the only things he was called out for. He was never called about any appliances in Ms. Brown's apartment. Mr. Chatman also testified that the appliances were replaced in Apartment A before Ms. Brown moved in.
In her deposition, taken on April 20, 2004, Ms. Brown testified that prior to returning home on the day of the fire, she and her daughters were shopping at the mall, although she could not remember which mall. Ms. Brown also stated that when she moved into the apartment, the stove was old and it was "disgusting." She stated the wiring in it looked "decayed and black." Ms. Brown testified that she complained to Ms. Floyd and Ms. Chatman about the stove and that someone from the apartment came in to check the temperature gauge. Although not specifically asked, Ms. Brown made no mention that Ms. Floyd asked her to make a list of her complaints, nor did she mention that she prepared a punch list or that she gave the list to Ms. Floyd.
Although a trial court's determination of credibility is entitled to deference on appellate review, an appellate court cannot shirk its duty of appellate review of fact by simply deferring to a trial court's factual determinations because its reasons for judgment are couched in terms of a credibility call. At some point, even a bare transcript is so deficient in terms of quality of evidence that the trial court's error is manifest, even if some credibility determinations must necessarily be made. God's Glory & Grace, Inc. v. Quik Intern., Inc., 05-1414, p. (La.App. 1 Cir. 6/9/06), 938 So.2d 730, 733-34, writ denied, 06-1739 (La. 10/6/06), 938 So.2d 86.
After reviewing the record in this matter in its entirety, we conclude that a reasonable basis does not exist for the trial court's judgment, although it is couched in terms of credibility. At the scene of the fire, Ms. Brown told Mr. Warren, an independent witness, that she had no previous problems with the stove. Clearly, this statement was made prior to time for reflection. The punch list appeared for the first time at the trial of this matter. The punch list was not mentioned by Ms. Brown in her deposition, nor was it mentioned in plaintiff's answer to the defendants' supplemental interrogatories, where she was asked to "list and describe any and all other pieces of documentation and demonstrative evidence which you might seek to use as exhibits at trial herein." Nor was there any mention of a punch list on the pre-trial order prepared by plaintiffs counsel. Additionally, in her petition, Ms. Brown makes no mention of the August 2001 punch list, but refers to Thanksgiving 2001, when she alleges she told the defendants about problems with the stove. Further, Ms. Brown's testimony was simply vague and inconsistent throughout.[6] Conversely, Ms. Floyd testified that she never received any complaints regarding the stove in Apartment A, which testimony was corroborated by that of Ms. Chatman and Mr. Chatman.
Thus, we do not find that a reasonable fact finder would credit Ms. Brown's story. Therefore, two permissible views of the evidence do not exist, and we conclude that plaintiff failed to prove that the defendants knew or should have known of any problems with the stove. Plaintiff's failure to prove this essential element is fatal to her claim for damages.

CONCLUSION
The judgment appealed from is reversed, and judgment is rendered in favor of the defendants, Bonnie Iris Floyd, Jeffery Floyd, and Shelter Insurance Company, and against the plaintiff, Nettie Brown. Costs of this appeal are assessed to Nettie Brown.
REVERSED AND RENDERED.
NOTES
[1] With her petition, Ms. Brown submitted an order to proceed without prior payment of costs based on her indigent status, which was signed by the trial court on March 10, 2003.
[2] A show cause order was issued by this panel ex proprio motu on September 28, 2007, noting that the December 7, 2006 judgment did not specify against whom it was rendered nor who was to pay the ordered amount, and ordered the parties to show cause why the judgment was a valid written judgment or to submit a valid written judgment. An amended judgment was signed on October 10, 2007, which added language that the judgment was rendered in favor of the plaintiffs and against the defendants.
[3] Subsequent to the filing of this suit, Title IX, "Of Lease" of Book III of the Civil Code was revised by Acts 2004, No. 821, eff. January 1, 2005. As part of that revision, LSR.S. 9:3221 was also amended. All references in this opinion to LSA-R.S. 9:3221 refer to that statute as it existed prior to the 2004 revision.
[4] We need not address the admissibility of this document as defendants did not assign it as error.
[5] We note that while the receipt identifies the street number of the apartment building, it does not identify any apartment in the building.
[6] For example, Ms. Brown's story changed as to where she was prior to the fire, where certain items in the apartment were located, and why she did not try to salvage her personal property after the fire. Further, with the exception of testimony regarding the stove, Ms. Brown's memory was generally vague and uncertain, such as in response to questions regarding her employment, where she lived after the fire, where certain items were kept in the apartment, and when certain things were done, such as preparing lists, after the fire.